STATE of Utah, Plaintiff and Appellee,

v.

Charles N. STRAIN, Defendant and Appellant.

No. 860531.

Supreme Court of Utah.

July 5, 1989.

Michael D. Esplin, Provo, for defendant and appellant.

David L. Wilkinson and David B. Thompson, Salt Lake City, for plaintiff and appellee.

HOWE, Associate Chief Justice:

Defendant Charles Nicholas Strain appeals his jury conviction of second degree murder, a first degree felony. Utah Code Ann. § 76-5-203 (1978, Supp.1988).

Defendant was arrested on February 20, 1986, in Scottsdale, Arizona, on a fugitive warrant issued in the state of Idaho. Upon arrest, Arizona detective Thomas Hill allegedly advised him of his *Miranda* rights. Four hours later, Detective Peter Bell of the Utah County, Utah, Sheriff's office questioned him about the shooting death of defendant's sixteen-year-old stepdaughter, Deanna, whose decomposed body had been found some five years earlier in Spanish Fork Canyon, Utah. Throughout this initial three-hour interview, defendant maintained his innocence with respect to that death. The following morning, Detective Bell resumed his questioning. This session was followed by another interrogation that evening by Detective Bell and also by Utah County Deputy Sheriff Scott Carter. The interrogation culminated in defendant's signing a statement, admitting the killing. He was subsequently charged with second degree murder.

Prior to trial, defendant filed a motion to suppress his confession. The motion cited inadequacies in the *Miranda* warning, as well as threats and promises made to him by Detective Bell which allegedly rendered his confession involuntary. This motion was granted by the trial court in view of inadequacies which it found in the *Miranda* warning given by Detective Bell. Subsequently, further evidence concerning defendant's arrest was discovered which prompted the trial court to reopen the hear-

ing wherein Arizona Detective Hill testified that he did recite the *Miranda* warning to defendant upon his arrest on the Idaho charges. In response, the trial court vacated its order suppressing defendant's statements. At trial, defendant again objected to the admission of his confession into evidence on the grounds that the *Miranda* warning given by Detective Hill was inadequate and that the confession was coerced. The trial court overruled both objections and admitted the confession. In so doing, the court did not specifically address the voluntariness challenge which focused on the threats and promises made to defendant. Defendant was found guilty of second degree murder and sentenced to a prison term of five years to life.

## I.

■ Defendant maintains that the trial court erred in failing to suppress his confession because the *Miranda* warning by Detective Hill was defective. The *Miranda* warning originated out of the landmark United States Supreme Court case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That case outlined those basic rights of which the accused must be adequately informed before any of his statements made to law enforcement officers may be used as evidence against him.

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

*Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

While *Miranda* is recognized as obligating police to follow certain procedures in their dealings with an accused, the decision did not prescribe that law enforcement officers adhere to a verbatim recitation of the words of the opinion. *Miranda*, however, did hold that "in the absence of a fully effective equivalent," statements made by a defendant could not be used as evidence against him. *Miranda*, 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725. Since *Miranda*, the United States Supreme Court has reaffirmed its intention of not extending the "rigidity" of that case to "the precise formulation of the warnings given a criminal defendant." *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 2807, 2809, 69 L.Ed.2d 696, 701 (1981) (per curiam). With this in mind, we examine the *Miranda* warning given to defendant upon his arrest.

Detective Hill testified at the reopened pretrial hearing on defendant's motion for suppression of his confession that he gave defendant the following *Miranda* warning:

> I said you have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning to be with you during questioning if you so desire. If you cannot afford an attorney, you have the right to have an attorney appointed for you by the court *at a later date*. Do you understand these rights?

(Emphasis added.)

Defendant argues that this warning implied that an attorney would not be available for him at the initial interview. He asserts that a *Miranda* warning must inform the accused that an attorney will be available immediately at the time of any interrogation. These conclusions are unwarranted. While the warning did inform defendant about the immediate unavailability of court-appointed counsel for him, we do not believe it carried any implication that he was required to submit to an interview with law enforcement officers without the presence of appointed counsel if he could not afford one. Furthermore, *Miranda* does not suggest that a suspect must be told he has the right to the immediate appointment of counsel:

> If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.
>
> This does not mean, as some have suggested, that each police station must

have a "station house lawyer" present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation.

*Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; *see also Poyner v. Commonwealth*, 229 Va. 401, 409–10, 329 S.E.2d 815, 822–23, *cert. denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 158 (1985).

Detective Hill's warning did not violate these principles. Defendant was informed of his right to counsel before and during any police interrogation. He was also informed of his right to remain silent. But the immediate right to counsel which defendant envisions is not within the scope of the *Miranda* decision. Once the accused requests court-appointed counsel, it is treated as a wish to remain silent, and the police cannot proceed to interrogate him until such counsel has been obtained or until defendant initiates the interview.

One additional point is helpful. In *California v. Prysock*, instances were examined where courts have held particular *Miranda* warnings inadequate in advising the accused of his right to court-appointed counsel. It concluded that *Miranda* warnings which "linked" the right of appointed counsel to some future point in time after the police interrogation violated *Miranda* principles. *Prysock*, 453 U.S. at 360, 101 S.Ct. at 2810. In some of these cases, the right to appointed counsel had been linked solely to appearances before the court, to the time when charges were to be filed, or to the time when the accused was transferred to another state. *United States v. Garcia*, 431 F.2d 134 (9th Cir.1970) (per curiam); *People v. Bolinski*, 260 Cal. App.2d 705, 67 Cal.Rptr. 347 (1968); *see also United States ex rel. Williams v. Twomey*, 467 F.2d 1248 (7th Cir.1972).

It is clear that Detective Hill's *Miranda* warning did not link defendant's right to counsel to any future point in time after police interrogation. The warning given by Detective Hill was the fully functional equivalent required by *Miranda*. Therefore, we hold that statements of defendant are not inadmissible due to a violation of *Miranda*.

## II.

■ Defendant next contends that he did not knowingly and voluntarily waive his privilege to remain silent and to have counsel before and during the interrogation. *Miranda* warnings were intended to guard against the inherently coercive nature of a custodial police interrogation by fully informing the suspect of the state's intention to use any self-incriminating statements to secure his conviction. *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410, 420 (1986). Once the accused has been so advised, he has the privilege of waiving these rights but must do so voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444, 475, 86 S.Ct. at 1612, 1628, 16 L.Ed.2d at 707, 724. This is generally acknowledged as meaning that the waiver must have been the product of a "free and deliberate choice rather than intimidation, coercion or deception" and executed with "full awareness both of the nature of the right being abandoned and [of] the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421. Furthermore, this determination requires an examination of the "totality of the circumstances surrounding the interrogation." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979).

The record not only discloses defendant's full awareness of the consequences of his waiver but also the lack of intimidation, coercion, or deception on the part of Detective Bell in this regard. The following portions of the interrogation demonstrate this:

[Interview on the morning of February 27, 1986.]

Bell: Kind of like the rights, like I gave you last night, you know you don't have to, you don't have to say anything if you want to.

Strain: Well, I understand that. That's not any problem. I just didn't know the necessity of it.

Bell: Um hum. Kind of still holds true today, you know, when we're talking today the same thing goes as last night, you don't have to talk if you don't want to.

Strain: I've always known that. But sometimes all I do is make it worse and I found that out a long time ago, when you don't tell them what they want then they think the worst and that's when you're convicted of something you don't know nothing about. It happened to me twice before.

[Interview on the evening of February 27, 1986.]

Bell: [T]he number one thing I want to make sure again is that you are very well aware of your rights. You are going to hear them over and over again—I told you last night and I told you this morning.

Strain: That ain't going to make any difference.

Bell: But you do have the right to remain silent.

Strain: Hum um.

Bell: You don't have to answer any of our questions if you don't want to.

Strain: I know this.

Bell: If you feel you need your attorney present, the State of Arizona I'm sure will be glad to appoint one for you.

Strain: Ya, but that would just tie you up longer.

It is clear that defendant did voluntarily and knowingly waive his right to remain silent and his right to counsel before and during the interrogation. The trial court did not err in this respect by refusing to suppress defendant's inculpatory statements.

### III.

■ Defendant next contends that the trial court erred by failing to suppress his confession because it was obtained through coercion by Detective Bell. Such a claim, if valid, would render the confession involuntary as being violative of defendant's fifth and fourteenth amendment rights against self-incrimination. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Specifically, defendant contends that Detective Bell threatened a first degree murder charge against him and possible execution, if convicted of that charge, if he did not admit his involvement in the homicide of his step-daughter. Set alongside this threat was an alleged promise by Bell which offered defendant the lesser charge of second degree murder if he admitted involvement in the murder. Detective Bell denied making such a promise to defendant.

Over the years, both federal and state courts have struggled with the concept of voluntariness and have employed several formulations in their attempts to apply it. Several courts have stated that a confession of the accused must be the product or result of a "free and unconstrained choice." Other courts have defined the concept of voluntariness by insisting that the confession be "freely self-determined," or the product of "rational intellect and free will." Another perspective frames the issue as "whether the defendant's will was overborne at the time he confessed." *See United States v. Gordon*, 638 F.Supp. 1120, 1144 (W.D. La.1986), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 380 (1987) (citations omitted). As required in an examination of a waiver of *Miranda* rights, the determination of voluntariness of confessions requires the court to consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973); *State v. Hegelman*, 717 P.2d 1348 (Utah 1986); *State v. Moore*, 697 P.2d 233 (Utah 1985). The mere representation to a defendant by officers that they will make known to the prosecutor and to the court that he cooperated with them, *United States v. Shears*, 762 F.2d 397 (4th Cir. 1985), or appeals to the defendant that full cooperation would be his best course of action, *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974), have been recognized as not coercive. However, as the State freely admits in the

instant case, most courts have found a confession involuntary where a threat to pursue a higher charge if the accused did not confess, or a promise to pursue a lesser charge if he did confess, was exhortative. *United States v. Tingle*, 658 F.2d 1332, 1335–37 (9th Cir.1981); *State v. Rhiner*, 352 N.W.2d 258, 262–63 (Iowa 1984).

The record indicates that during the course of the February 27, 1986 morning interrogation, Detective Bell made the following statement to defendant:

Now, what I'm trying to tell you right now Charlie is, all you have to do, all you've got to do ... the only thing that is keeping you from going back to the State of Utah and looking at a possible execution on a first degree murder charge or a second degree murder charge, which is some jail time. The only thing that keeps between them two, is "yes, I did or no I didn't." Yes, second degree murder, no, I didn't, I will prove that you did and you are looking at a possible execution date in the State of Utah. That's all I want to hear from you Charlie, all I want to hear is yes or no. All I want to hear is, is there going to be first degree murder or second degree murder. I don't want to hear, "No I didn't have nothing to do with it," because I can prove it and I'm going to prove it. I'll go back to the State of Utah today, the County Attorney is going to file....

Later, Detective Bell repeated this line of interrogation.

Utah is, and Utah is going to bring you back down. Charlie we're going to try you for murder. So, just tell me right now, let's just (not understandable), yes for jail time or no, are we going to go to trial and for possible execution. That's all I want to hear from you is just yes or no.

Defendant immediately asked, "Just that simple?" Upon this response, Detective Bell then framed his dichotomous proposal into what easily would have been taken as an offer of a promise of leniency:

Just that simple. *And I can guarantee it Charlie, I can guarantee it's that* *simple.* My God, this thing has been drug on for five years. The little girl's body up in the canyon, the soul was crying for justice.

(Emphasis added.)

Not only did Detective Bell threaten a first degree murder charge and possible execution if convicted, we believe that he also crossed the line when he offered defendant a promise as evidenced by his personal guarantee. The detective's offer was framed strictly in terms which offered defendant a second degree murder charge and jail time for his "yes, I did." Adding to his proposal the dimension of leniency, Bell informed defendant of the potential first degree murder charge against him and possible execution upon conviction if he refused his guaranteed offer.

Upon Bell's extension of this promise of leniency, defendant attempted to relate his philosophy of life but was interrupted by Detective Bell: "I don't want to hear it Charlie. All I want to hear is yes or no." After a few sympathetic comments by Detective Bell concerning defendant's hard life, Bell continued to press:

Well, you are [trying to snow the law enforcement] by not telling me yes or no, because I know, Charlie, I know. Okay, I'm just going to tell you right out flat, I know. And all I have to do is prove it to twelve jurors in the State of Utah. All you have to do is just make an affirmative that, yes, you know too, or no, you don't know and we'll have a trial. That's all I'm asking for.

Soon after this statement, Detective Bell offered defendant a moment to think. Then after one final push by Bell, defendant began to admit his involvement in the murder which eventually resulted in a signed statement that evening admitting culpability for the killing.

It is clear that the statements made by Detective Bell to defendant were impermissibly coercive because they carried a threat of greater punishment or a promise for lesser punishment depending on whether he confessed. The State, however, urges us to affirm the admission of the confession because looking at the "totality of all

the surrounding circumstances," the improper statements of Detective Bell did not induce defendant to confess. The State points out that defendant was an adult in his forties and familiar with the criminal justice system. Certain statements made by defendant in the course of the interrogation indicated that he little cared whether he lived or died. He stated that he had "no life left"; that he did not care if he were executed; and that he cared only about the persons he would leave behind.

While in *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), the statement was made that any threat or promise, however slight, renders a confession involuntary and inadmissible, later cases do not repeat that rigid rule but follow the totality of all the circumstances test. In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Court found that a guilty plea made by an accused was not rendered involuntary by the sole fact that the statute under which he was charged permitted imposition of the death sentence only upon a jury's recommendation and thereby made the risk of death the price of a jury trial. This death penalty provision had earlier been held to be unconstitutional in *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), because it imposed an impermissible burden upon the exercise of a constitutional right. Notwithstanding the coercive effect of the statute in effect at the time the defendant in *Brady* entered his guilty plea, the Court, in a later proceeding brought by Brady to set aside his guilty plea, looked at all of the relevant circumstances surrounding the entry of the plea and found that there were. other valid considerations which prompted its making, viz., a co-defendant had given a confession, decided to plead guilty, and became available to testify against Brady. See also *People v. Conte*, 421 Mich. 704, 365 N.W.2d 648 (1984), where the Supreme Court of Michigan rejected the strict per se test sometimes attributed to *Bram v. United States*, and adopted "the simple rule that a confession *caused* by a promise of leniency is involuntary and inadmissible." (Emphasis added.)

In the instant case, the trial court did not address defendant's contention that even though an adequate *Miranda* warning had been given to him, his subsequent confession was the result of coercive threats and promises made by the interrogating officers. We therefore do not have before us an adequate record upon which we can determine the question of voluntariness. There is no testimony of defendant as to what considerations prompted his confession. As earlier stated, while coercive threats and promises were made to him, he also made statements which indicate that the improper statements of the officers did not induce him to confess.

We therefore remand this case to the trial court for an evidentiary hearing to determine the voluntariness of defendant's confession under a "totality of all the surrounding circumstances." If the confession is found to have been voluntarily given, the conviction is affirmed. However, if the confession is found to have been involuntarily made, a new trial should follow.

HALL, C.J., and STEWART and DURHAM, JJ., concur.

ZIMMERMAN, Justice (concurring):

I join in the majority opinion. However, in the absence of some statement as to how we view the record before us, our remand for a determination of the question of voluntariness raises the possibility of an avoidable additional appeal and remand. As the majority notes, the detective's comments were plainly outside the bounds of permissible interrogation and were, on their face, coercive. Moreover, the transcripts demonstrate that defendant's confession was made immediately after these coercive statements. For the benefit of the trial court and the parties, I think we should indicate that while the State has contended that "it may be *possible* ... to find ... that Bell's improper statements did not actually induce defendant to confess" (emphasis added), if such a finding were based on nothing more than the evidence presented to us at this point, there

would be some doubt as to such a finding's sustainability.