1999 UT 80

STATE of Utah, Plaintiff and Appellee,

v.

Todd Jeremy RETTENBERGER, Defendant and Appellant.

No. 970385.

Supreme Court of Utah.

Aug. 27, 1999.

---

Jan Graham, Att'y Gen., J. Frederic Voros, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Scott L. Wiggins, Salt Lake City, for defendant.

DURHAM, Associate Chief Justice:

¶ 1 This is an appeal from an interlocutory order denying defendant Todd Jeremy Rettenberger's motion to suppress his confession. Rettenberger is charged with murder and aggravated robbery. Rettenberger contends that the district court erred in concluding that his confession was not the involuntary product of police coercion. Rettenberger also argues that the district court erred in determining that he failed to unequivocally re-invoke his right to counsel and his right to remain silent. We reverse and remand.

## BACKGROUND

¶ 2 On the morning of November 20, 1996, Rettenberger, then age eighteen, was taken into custody by the Woods Cross Police for questioning concerning the murder of Matthew John Wicker. Detective Jeff Corbin, a detective with the Bountiful Police Department Metro Narcotic Strike Force, gave Rettenberger his *Miranda* warnings.[1] Rettenberger had never previously been arrested or interrogated by the police. At approximately 11:30 a.m., Detective Corbin began to interrogate Rettenberger. At the outset of the interrogation, Detective Corbin reminded Rettenberger of his rights under *Miranda*—

DETECTIVE CORBIN: Todd, at the Sheriff's Office I talked to you a little bit about your rights. You know, we discussed, you know, the thing with the attorney and what not. I just want to verify that you have those rights and that you can exercise those rights any time you feel like it.

MR. RETTENBERGER: Okay.

A few minutes later, after Detective Corbin had informed Rettenberger that he was a suspect in the murder case, the following exchange took place:

DETECTIVE CORBIN: What I want you to do at this point is to be your own best friend. I want you to tell me what you know. I want you to help me to help you so that I can explain to the judge this wasn't pre-meditated, that it was a heat of the moment thing that happened. Things got out of hand, he struggled with you guys.

MR. RETTENBERGER: There's no way, there's no way that I even did this. I am getting, I'm getting an attorney. I am pleading innocent. I was not there, I did not murder this guy.

DETECTIVE CORBIN: That is your right to plead innocent.

MR. RETTENBERGER: And I do not know nothing about this.

DETECTIVE CORBIN: Let me go see if the rest of the information is ready.

MR. RETTENBERGER: Can I go now?

DETECTIVE CORBIN: Nope, hang on. Let me go see what else we've got. We've got stuff coming in right and left, so -

Detective Corbin then exited the room. He returned shortly and resumed questioning of Rettenberger. Later in the interrogation, a similar exchange took place:

MR. RETTENBERGER: Can, can I have a lawyer talk to you guys? Do I have that right?

DETECTIVE CORBIN: I told you your rights, remember, at the Sheriff's office?

MR. RETTENBERGER: Yeah, I just need to -

DETECTIVE CORBIN: And I told, and I told you—let me finish. I told you your rights over here. I told you what I expected and what you could expect from me, okay?

¶ 3 The first interrogation lasted approximately one and one-half to two hours. Towards the end of the first interrogation, Rettenberger began to admit his involvement in the murder. At the conclusion of the first interrogation, Rettenberger was placed in solitary confinement at the Davis County correctional facility. At approximately 2:30 the following afternoon, Rettenberger was again interrogated. At the beginning of the second interrogation, Rettenberger attempted to recant his previous inculpatory remarks, but later in the interrogation he again admitted that he had been involved in the crime. Both interrogations were videotaped,

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and the tapes have been viewed by the district court and this court.

¶ 4   During the interrogations, the interrogating officers, Detective Corbin and Officer Timothy, made several references to the potential penalties facing Rettenberger, including the death penalty. They refused to allow him to speak with his mother and refused to allow him to use the restroom. As we discuss below, the officers lied to Rettenberger numerous times concerning the existence, nature, and strength of evidence they had collected against him.

¶ 5   Before trial the defendant moved to suppress his confession on the grounds that (1) his confession was the involuntary result of police coercion and (2) he had invoked his rights to counsel and to remain silent and that those invocations were not honored by the police.

¶ 6   During the suppression hearing, Vicki Gregory, Ph.D., J.D., testified that based upon her evaluation of Rettenberger and a review of his medical and psychological records she formed the expert opinion that he had Attention Deficit Disorder ("A.D.D."), a below average I.Q., and the maturity level of a fifteen-year-old. She also testified that he exhibited symptoms of depression, anxiety disorder, thought disorder, schizophrenia, and Dependent Personality Disorder. Dr. Gregory concluded that Rettenberger would be highly susceptible to psychological manipulation by police interrogators, that he would be overly compliant and dependent upon the police officers, and that he would tend to agree with the officers' statements during an interrogation in order to relieve his stress. Dr. Gregory also opined that Rettenberger would experience greater anxiety in solitary confinement than would the average person.

¶ 7   The district court found that Dr. Gregory's conclusions were consistent with the testimony of Detective Corbin. Detective Corbin testified that, based on his experience with one of his own children, he recognized that the defendant exhibited symptoms

of A.D.D., had the maturity level of a fifteen-year-old, was under extreme stress and anxiety during the arrest and interrogations, and was afraid of the death penalty.

¶ 8   The district court first ruled that Rettenberger's requests for an attorney were equivocal and therefore the officers had no obligation to stop the interrogation. The district court also concluded that, although "a close call," the interrogation was not "objectively coercive." On that basis, the district court concluded it was unnecessary to examine whether Rettenberger's confession was voluntary.[2]

¶ 9   We now address Rettenberger's contention that the district court erred in ruling that his confession was not coerced and in declining to consider whether the confession was involuntary. Because we reverse the district court's ruling and hold that Rettenberger's confession was the involuntary product of police coercion, we need not address the other issues raised on appeal.

### STANDARD OF REVIEW

■   ¶ 10   In "reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review." *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993). The ultimate determination of voluntariness is a legal question; accordingly, we review the district court's ruling for correctness. *See id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). We set aside a district court's factual findings only if they are clearly erroneous. *Id.*

### ANALYSIS

■   ¶ 11   "The Due Process Clause of the Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The United States Supreme Court has held that, un-

---

**2.** Although we reverse based on our interpretation of the relevant case law, we take this opportunity to commend the district judge for his painstaking review in this case. Among other things, he watched the videotaped interrogations in their entirety at least four times, catalogued the occasions in which the interrogating officers gave the defendant misleading information, and created numerous appendices to aid in our analysis.

der the Due Process Clause, " 'certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.' " *Id.* (quoting *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). In addition, "[t]he Fifth Amendment [to the United States Constitution] 'protects individuals from being *compelled* to give evidence against themselves.' " *State v. Piansiaksone,* 954 P.2d 861, 865 (Utah 1998) (quoting *State v. Troyer,* 910 P.2d 1182, 1188 (Utah 1995)). Accordingly, analysis of whether admission of a confession into evidence violates the Fifth or Fourteenth Amendment does not turn solely on the "voluntariness" of the confession. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Connelly,* 479 U.S. at 167, 107 S.Ct. 515 (analyzing voluntariness under Fourteenth Amendment); *see also Piansiaksone,* 954 P.2d at 865 (holding that, "[t]o violate the Fifth Amendment, an accused's admission must, by definition, be coerced").

¶ 12 In making its ruling below, the district court "adopted a two-step 'voluntariness' inquiry in which coercion is first determined without regard to defendant's subjective characteristics." Under the district court's approach, it first determined "whether the police activity was objectively coercive and second, if necessary, whether the defendant's will was actually overcome." The district court believed that this approach was mandated by the United States Supreme Court's decision in *Connelly,* which it interpreted to "change the scope of ... inquiry from the prior 'totality of circumstances' inquiry, including defendant's subjective characteristics, to a two-step determination."

¶ 13 Under the first prong of the test, the district court found that the interrogating officers misled Rettenberger on "numerous occasions concerning the strength of the evidence they had accumulated against him"; that the officers made "significant references to defendant being charged with capital murder, the lethal consequences of being charged with capital murder, and the possibility of

lesser charges ultimately being brought, depending on defendant's cooperation"; that the officers did not allow Rettenberger to use the bathroom until the conclusion of the first interrogation despite his requests; that the officers did not allow Rettenberger to call his mother; and that Rettenberger was placed in solitary confinement between the two interrogations. The district court acknowledged that these findings "come close to justifying" a finding of "objective coercion." Nonetheless, the court concluded that "the officers' conduct was not objectively coercive." Accordingly, the district court did not proceed to the second step to determine if Rettenberger's will was overborne by the investigators' conduct.

■ ¶ 14 Prior to *Connelly,* the Supreme Court held that, in order to determine whether a challenged confession was constitutional under the Fifth and Fourteenth Amendments, a court must examine the "totality of circumstances to determine whether a confession had been 'made freely, voluntarily and without compulsion or inducement of any sort.' " *Withrow v. Williams,* 507 U.S. 680, 689, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (quoting *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)(internal citation and quotation marks omitted)); *see also State v. Strain,* 779 P.2d 221, 225 (Utah 1989). " '[T]he totality of circumstances [includes] both the characteristics of the accused and the details of the interrogation.' " *Strain,* 779 P.2d at 225 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and citing *State v. Hegelman,* 717 P.2d 1348 (Utah 1986); *State v. Moore,* 697 P.2d 233 (Utah 1985)). As the district court itself recognized, under the totality of circumstances test, courts must consider such external factors as the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers. *See Davis v. North Carolina,* 384 U.S. 737, 746–47, 752, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966)(duration, treatment); *Haynes v. Washington,* 373 U.S. 503, 514–15, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (threats, promises, absence of family and counsel); *Rogers v. Richmond,* 365 U.S. 534,

535, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (threats); *Spano v. New York,* 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (police trickery); *Leyra v. Denno,* 347 U.S. 556, 559–61, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Harris v. South Carolina,* 338 U.S. 68, 71, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949) (duration and persistence); *Piansiaksone,* 954 P.2d at 866.

¶ 15  In addition, "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Connelly,* 479 U.S. at 164, 107 S.Ct. 515.  Thus, under the totality of circumstances analysis, courts must also consider such factors as the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system.  *See Clewis v. Texas,* 386 U.S. 707, 712, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (education); *Culombe v. Connecticut,* 367 U.S. 568, 602–03, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (mental deficiency); *Spano,* 360 U.S. at 322, 79 S.Ct. 1202 (emotional instability); *Fikes v. Alabama,* 352 U.S. 191, 193, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) (mental health); *Piansiaksone,* 954 P.2d at 866; *Strain,* 779 P.2d at 227 (age and familiarity with judicial system).

¶ 16  Consistent with examination of these factors, the district court in the present case, found that at the time of the interrogations, the eighteen-year-old Rettenberger "(a) was suffering from A.D.D.; (b) had the maturity level of a fifteen-year-old; (c) had a below average I.Q.; (d) had fear of the death penalty being imposed; and (e) was more susceptible to stress and coercion than the average person."  Moreover, the court specifically found "that the interrogating officers understood and were aware of those characteristics and susceptibilities ... at the time they were conducting the interrogation."  However, the district court interpreted *Connelly* to replace the "totality of circumstances" examination with a two-step analysis requiring a threshold finding that the officers were "objectively coercive" in procuring the confession before it could consider whether the suspect's will was in fact overcome by that coercion.

¶ 17  We do not share the district court's view that *Connelly* constituted a wholesale departure from previous voluntariness jurisprudence or that it established a two-part test.  Unlike the district court and other courts that have adopted such a two-step analysis, we believe that *Connelly* stands for the limited proposition that a defendant's mental condition is not in itself sufficient to make a confession involuntary. *See Connelly,* 479 U.S. at 165, 107 S.Ct. 515.  Although *Connelly* states that a determination of involuntariness cannot be predicated solely upon a defendant's mental state, "his mental state is relevant 'to the extent it made him more susceptible to mentally coercive police tactics.'" *Smith v. Duckworth,* 910 F.2d 1492, 1497 (7th Cir.1990) (quoting *Andersen v. Thieret,* 903 F.2d 526, 530 n. 1 (7th Cir.1990)).

¶ 18  *Connelly* involved a defendant who believed (construing *Connelly* ) the "voice of God" had directed him either to confess to a killing or to commit suicide.  As instructed by the "voice," the defendant approached a police officer in downtown Denver, Colorado, and told the officer that he had murdered someone and that he wanted to talk about it.  After twice receiving his *Miranda* rights and twice insisting that he understood those rights but nonetheless wished to talk, Connelly was asked by an officer "what he had on his mind." *Id.* at 160, 107 S.Ct. 515.  Connelly then confessed to the murder of a young woman. *Id.* There was, in short, no police coercion of any kind in *Connelly.*  The issue was simply whether a defendant's mental state alone could be sufficient to render a confession constitutionally involuntary.  The Court held that it could not, stating, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164, 107 S.Ct. 515 (footnote omitted).  Furthermore, the Court specifically reaffirmed the principle that a confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession. *See id.* at 164–65, 107

S.Ct. 515 (citing *Blackburn v. Alabama,* 361 U.S. 199, 207–08, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Townsend v. Sain,* 372 U.S. 293, 298–99, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). In sum, "[t]o be involuntary, there must be a causal relationship between the coercion and the subsequent confession." *Mabe,* 864 P.2d at 893.

¶ 19  We thus conclude that the trial court erred in failing to conduct a "totality of circumstances" examination of Rettenberger's confession to determine whether the interrogators exploited Rettenberger's disabilities and deficiencies in such a way that his "will was overborne." *Arizona v. Fulminante,* 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We now consider the factors set forth above which a court should consider in conducting a "totality of circumstances" examination.

## I.  OBJECTIVE FACTORS

### A.  Police Misrepresentations

¶ 20  We have recognized that " '[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.' " *State v. Galli,* 967 P.2d 930, 936 (Utah 1998) (quoting *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir.1994)). However, in certain cases, police misrepresentations may be sufficiently egregious to overcome a defendant's will so as to render a confession involuntary. *See id.* (stating "[w]hile the detectives' half-truths … should not be condoned, we are not convinced that this was sufficient to overcome his free will and spirit"). We believe the number and nature of the misrepresentations in this case come close to or exceeds that threshold.

¶ 21  The district court cataloged some 36 false statements made to Rettenberger by the police during his interrogation. The overwhelming majority of these misrepresentations were not merely "half-truths" but were complete fabrications about testimonial and physical evidence of Rettenberger's guilt. The officers repeatedly misrepresented to Rettenberger that they had testimony of numerous eye-witnesses and co-defendants implicating him. They falsely informed Rettenberger that he had been the subject of an extensive "three-week" undercover investigation. Finally, although they had *no* physical evidence linking Rettenberger to the crime, they told or suggested to him that they found fingerprints at the crime scene that the crime lab had confirmed were a "positive match" to his; they had ballistic test results implicating him; they had blood samples implicating him; they had a bloody shoe-print from the crime scene that matched his; they had found blood on his shoe; they had unspecified "physical evidence" that linked him to the crime; they had evidence that his car was at the crime scene; they had "blood splatter" evidence connecting him to the crime; they had found fingerprints of "everyone involved" at the crime scene; they had records of phone conversations incriminating him; they had knowledge of the gun used, implicating him; they had incriminating hand prints, palm prints, fingerprints, and shoe prints at the scene of the crime; they had found blood in his car; and they had more evidence implicating Rettenberger than the police had in the O.J. Simpson case. In sum, although the State, in fact, had no physical evidence implicating Rettenberger, the officers sought to convince Rettenberger that the State had an air-tight case against him. As Detective Corbin told Rettenberger, "We know the answer to every question we're asking. We want to hear your version."

¶ 22  Chief among the many problems with such duplicity is that it may lead wrongly accused suspects "to see themselves as either being set up or railroaded." Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action,* 74 Denv. U.L.Rev. 979, 1044 (1997). Such a suspect may well determine that "continued resistance is futile (because the police have evidence that will convict him despite his innocence)." Welsh S. White, *What is an Involuntary Confession Now?,* 50 Rutgers L. Rev. 2001, 2053 (1998). Such a suspect may also conclude that, given the futility of resistance, it is most prudent to cooperate and even confess falsely in order to get leniency.

¶ 23 A suspect may also be more likely to confess when faced with assertions, as here, that the State has evidence of fingerprints, palm prints, ballistic evidence and the like, implicating him because "[b]oth the guilty and the innocent have a harder time explaining away evidence that is allegedly derived from scientific technologies." Ofshe & Leo, *The Decision to Confess Falsely*, at 1023. In this case, it is clear that Rettenberger became convinced that the police had sufficient scientific evidence to prove his guilt, as is evidenced by the following exchange that took place late in the interrogations:

> DETECTIVE CORBIN: We're going to tell you what we think happened, and it's up to us to prove it.
>
> MR. RETTENBERGER: You guys are going to prove it.
>
> DETECTIVE CORBIN: Do you think we are?
>
> MR. RETTENBERGER: Fingerprints -
>
> OFFICER TIMOTHY: Of course we are.
>
> MR. RETTENBERGER:—all this stuff, of course you are.

Extreme duplicity as was used here may render a confession involuntary and, as here, raise serious doubt about its reliability.

### B. False Friend Technique

¶ 24 Rettenberger's interrogation took place in yet a larger context of deception. The interrogating officers made extensive use of the so-called "false friend" technique, whereby they represented to Rettenberger that they were his friends and that they were acting in his best interest. *See* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.2 (2d ed.1992). This technique is commonly used in police interrogations because "resistence to the disclosure of information is considerably increased ... if something is not done to establish a friendly and trusting attitude on the part of the subject." Welsh S. White, *Police Trickery in Inducing Confessions*, 127 U. Pa. L.Rev. 581, 614 (1979) (quoting Robert F. Royal & Stephen R. Schutt, *The Gentle Art of Interviewing and Interrogation: A Professional Manual and Guide* (1976)).

> In this atmosphere ... the suspect is fooled into trusting that the interrogator's behavior will conform to the norms of friendship: the interrogator will loyally help the suspect out of the jam, advise the suspect to confess only if confession will be beneficial [to the suspect], and so on.

Margaret L. Paris, *Faults, Fallacies, and the Future of Our Criminal Justice System: Trust, Lies, and Interrogation*, 3 Va. J. Soc. Pol'y & L. 3, 21–22 (1995).

¶ 25 The State suggests that the false friend approach cannot be coercive because it does not utilize actual or threatened physical or emotional abuse such as that found in some of the earlier landmark coerced-confessions cases. However, we have never held that physical or overt emotional abuse is a pre-requisite for a finding of coercion. "Evidence sufficient to support a finding that a confession is involuntary must reveal some physical or psychological force or *manipulation* that is designed to induce the accused to talk when he otherwise would not have done so." *State v. Hegelman*, 717 P.2d 1348, 1350 (Utah 1986) (emphasis added).

¶ 26 Obviously, the false friend strategy bears no resemblance to abusive coercion of the "third-degree" variety. This does not mean that the false friend technique cannot, in some circumstances, be coercive. Indeed, the false friend technique may be ideally suited to extract an involuntary confession from certain types of suspects who, like Rettenberger, have below-average cognitive abilities, A.D.D., and Dependent Personality Disorder, making them overly compliant, submissive, and anxious to receive reassurance and approval from other people.

¶ 27 The extent to which the interrogating officers were able to convince Rettenberger that they were not his adversaries but were looking out for his best interests is illustrated by a colloquy that occurred towards the end of the second day's interrogation:

> DETECTIVE CORBIN: I'm going to try and come up tomorrow, okay. Now, you may talk to your attorney tomorrow and he may tell you not to talk to me, but if I come and I, you know, I just -
>
> OFFICER TIMOTHY: If you're just kicking it, there's no big deal.

DETECTIVE CORBIN: Yeah, okay?

MR. RETTENBERGER: I'm going to go over it inside and out right when I get there. I am going to tell my attorney, "It's like this. These guys have already helped me and they're trying to help me, and I know they're trying to help me, so I'm going to talk to these guys."

¶28 We do not hold that the use of the false friend technique in police interrogations is, standing alone, sufficiently coercive to produce an involuntary confession. The significance of the stratagem comes in relation to other tactics and factors. The false friend stratagem provides an environment in which other interrogation tactics may become coercive. To the extent that Rettenberger suffers from mental disabilities and deficiencies, and to the extent that he believed the officers were protecting his best interests, he was less likely to question the false claims about the evidence against him; was less likely to clearly invoke his right to counsel or to remain silent; was more likely to "parrot" back the details the officers suggested, whether or not they were true; was more likely to place stock in any promises or threats that the officers made, however ambiguous they might be; and was more likely to confess, whether guilty or innocent.

### C. Threats and Promises

¶29 The district court found that the officers made "significant references to defendant being charged with capital murder, the lethal consequences of being charged with capital murder, and the possibility of lesser charges being brought, depending on defendant's cooperation." We have recognized that an interrogation can be "impermissibly coercive because [it] carried a threat of greater punishment or a promise for lesser punishment depending on whether [a defendant] confessed." *Strain,* 779 P.2d at 226. The district court, relying on *Strain,* found that the officers did not "promise or guarantee a lesser charge if [the defendant] confessed." In reaching this conclusion, the district court focused on the fact that on several occasions the officers stated that they could not guarantee the sentence Rettenberger would receive if he confessed. In so finding, however, the district court glossed over the several occasions in which the officers strongly suggested that Rettenberger would not face the death penalty as long as he confessed to the crime.

DETECTIVE CORBIN: Stay with me, okay. Stay with me. He—It shouldn't have happened, it was a mistake. A lot of things have taken place in the last three weeks since then. The man wants to turn things around, the man does not want to die. He does not want to face life in prison. He's got his entire life ahead of him. *And we're going to make that life happen.*

. . . .

DETECTIVE CORBIN: Now, I'm not going to blow smoke up your ass. I'm not going to tell you that nothing's going to happen here. Stay with me. I'm not going to tell you that, oh hey, we're going to get you back home tomorrow. But you know what? *We might get you back home at the end of the week, we might get you back home at the end of next week.*

. . . .

DETECTIVE CORBIN: And I mean, it's like you said earlier, I could die, I could die. *You don't have to die, okay? You don't have to spend the rest of your life in prison.* We can get to the bottom of this thing, hear your version, we can sort it out from here.

. . . .

DETECTIVE CORBIN: Okay, explain to me everything that's happening, go through the whole thing. You won't have any questions, you won't have any fears. *You already know what's the worst, and you won't have that.* You'll know exactly what's happening.

. . . .

OFFICER TIMOTHY: You know, you made a mistake, yeah. You know, you did, you made a big screw up. But like we said, you didn't mean to do that. Yeah, you should do some time for the robbery, you know, you shouldn't have done that.

You know better than that, you're smarter than that.

(Emphasis added.)

¶ 30 Promises of leniency necessarily imply the threat of harsher punishment. On some occasions in the interrogations, that connection was made explicit:

DETECTIVE CORBIN: Right now you're booked on a capital offense. Right now capital offenses are punishable by death, period. You're looking at lethal injection, okay? You're looking at a firing squad, what are the other choices, is that it?

OFFICER TIMOTHY: Hanging.

DETECTIVE CORBIN: Hanging, okay? So basically what you're talking about unless you're a macho guy, you're probably looking at lethal injection, okay? *I don't think we even need to go there. You see what I'm saying? Let's just put that behind us, let's look at what really happened that night, and let's get this death row bullshit out of the way,* and let's get you to a point where you're able to say, "Hey look, okay, I'm cutting the bullshit. I know what happened, this is what happened."

(Emphasis added.)

¶ 31 At points in the interrogations, the officers suggested to Rettenberger that the murder could be recast as a crime far less serious in nature than capital homicide.

This tactic is effective at eliciting admissions for the same reason that more explicit promises of prosecutorial leniency work: because the interrogator communicates that the suspect will receive a reduced level of punishment ... if he admits to a description of the offense the interrogator finds acceptable.

Ofshe & Leo, *The Decision to Confess Falsely*, at 999. In one form or another, the officers suggested that the murder was unintentional at least 39 times during the interrogations. Among other things, they told Rettenberger that the killing "wasn't intentional"; it "started out as one thing," but "things got out of hand"; they knew he was "not a murderer"; the wounds from the gunshot "shouldn't have been fatal"; he "didn't

mean to" kill anyone; he was "not a bad person"; "you guys didn't mean for this to happen"; the officers could "explain to the judge that this thing wasn't premeditated"; "things got out of hand, he struggled with you guys"; they knew Rettenberger "didn't go in there with the intention of killing him." In short, they told him they believed "the whole thing was a mistake." The legal significance of Rettenberger's intent was made explicit:

DETECTIVE CORBIN: This—no one meant for this to happen. *This was not a capital offense. This was not a situation where you guys planned on doing this. This was not pre-meditated. Yeah, the robbery was. So it's robbery. The time you get on robbery, bare minimum. First offense, you're hardly looking at anything.*

(Emphasis added.)

¶ 32 These and similar statements by the officers, standing alone, may not have overcome Rettenberger's will such that his confession was involuntary. At a minimum, however, they constitute evidence that, when considered in light of the totality of circumstances, strongly weighs against the conclusion that the confession was voluntary.

### D. Other Factors

¶ 33 Another important consideration is whether the defendant was subjected to extended periods of incommunicado interrogation. Cf. *Mabe*, 864 P.2d at 894. In the present case, Rettenberger's interrogations took place over a two-day period. The first interrogation lasted between one and a half to two hours. Rettenberger was then placed in solitary confinement where he spent approximately 22 hours with neither pillow nor blanket. The next day he was interrogated a second time.

¶ 34 Although the State concedes some "troubling conduct" occurred in the first interview, it argues that the two interrogations should be viewed as separate events and that any illegality in the first interview was cured by the subsequent period of isolation. We cannot agree. It is true that the passage of time can, in some circumstances, "dissipate any lingering effects of police coer-

cion." *Mabe*, 864 P.2d at 894. In this case, however, it is not appropriate to view Rettenberger's time in solitary confinement as curative. In this case, however, the evidence indicates that the isolation exacerbated Rettenberger's disposition. At the suppression hearing, Dr. Gregory testified that the period of solitary confinement would have caused Rettenberger to have "increased vulnerability" and "anxiety," compromising "his ability to make decisions." Furthermore, the character and content of the second interrogation related directly to the first. Where there exists a "causal relationship" between two interviews, it is not appropriate to view them in isolation. *See id.* In this case, we conclude that the two interrogations and the period of isolation "[a]ll were simply parts of one continuous process." *Leyra v. Denno*, 347 U.S. 556, 561, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

¶ 35    Other factors also weigh against the State's claim that the confession was voluntary. During the first interrogation, Rettenberger made several requests to call his mother or to use the telephone. Although the officers suggested that he would be allowed to call his mother, he was not. Furthermore, Rettenberger's parents contacted the police to request that they be allowed to supply a lawyer for him. Their request was denied. In addition, despite request, Rettenberger was not allowed to use the bathroom. The officers seldom denied any of Rettenberger's requests outright; they brushed them aside with vague references and changes of subject. The interview videotapes demonstrate that Rettenberger was easily distracted from his requests by this technique.

¶ 36    Finally, although this court is not prepared to take judicial notice of hypnotic techniques, and the parties did not brief this issue, we express concern that a suggestive hypnotic interrogation technique may have been utilized in the first interrogation. *See* Appendix. We take this opportunity to note that we have held hypnotically enhanced witness testimony to be inherently unreliable and inadmissible. We further note that the reliability of such testimony will not improve merely because the hypnotically enhanced testimony comes from a defendant in the form of a confession. *See State v. Tuttle*, 780 P.2d 1203, 1207–11 (Utah 1989).

## II.  SUBJECTIVE FACTORS

¶ 37    We now consider Rettenberger's subjective characteristics, especially as known to the interrogating officers, to determine the extent to which those characteristics made him more susceptible to manipulation. All of the factors discussed above become more significant when Rettenberger's personal characteristics are taken into account. Rettenberger was eighteen years old at the time of the interrogation, had the maturity level of a fifteen-year-old, and had a below-average I.Q. "The concern in a case involving a defendant of subnormal intelligence is one of suggestibility." *Jurek v. Estelle*, 623 F.2d 929, 938 (5th Cir.1980). That concern is heightened here, where the defendant had had little prior experience with the judicial system, suffered from A.D.D., and exhibited symptoms of depression, anxiety disorder, thought disorder, schizophrenia, and dependent personality disorder, making him overly compliant and particularly vulnerable to psychological manipulation.

¶ 38    In addition, as the district court found, Detective Corbin, based on personal experience, recognized that Rettenberger exhibited symptoms of A.D.D., had the maturity level of a fifteen-year-old, was under extreme stress and anxiety during the interrogation, and was afraid of the capital charges being brought against him. Furthermore, the district court specifically found that the officers also knew that the defendant had a below-average I.Q. and that he "was more susceptible to stress and coercion than the average person."

¶ 39    These factors raise serious questions regarding both the voluntariness and reliability of the confession. As Detective Corbin wrote in his report, during the interrogation Rettenberger "seemed to look to me for answers to what was going on." He further noted that "during both interviews I observed one characteristic portrayed by Rettenberger and that was that he wanted to confess what ever [sic] it would take in order not to go to prison for an extended period of

time or face the death penalty." The video-tapes of the interviews support this assessment at numerous points. After Rettenberger had confessed his involvement in the crime at the conclusion of the first interrogation, the following colloquy took place:

> OFFICER TIMOTHY: The worst is over, right? You told us. Now we just have to do -
>
> MR. RETTENBERGER: Was I right? I was right, right? What I told you guys was not—wasn't, no you don't think I'm bullshitting you, right?

¶ 40  In fact, Rettenberger's confession contains little information that was not first provided or suggested by the interrogating officers. During the interrogations, the officers told or suggested to Rettenberger that he had been involved in the murder/robbery that had taken place at Motel 6; the murder had been an accident; more than one person had been involved in the crime; the crime took place in the Motel 6 office; the crime took place on October 29, 1996; the crime took place at approximately 9 p.m.; there were two cars involved in the crime; one of those cars was his; Rettenberger and his accomplices had driven by the Motel 6 before stopping to rob it; he had parked in the front driveway of the Motel 6; two of his friends and his uncle were also involved in the crime; one of his accomplices probably served as a lookout and one stayed in the car as the driver; not much money was involved in the robbery; he was the only one who entered the Motel 6; the victim was sitting or eating at a table when Rettenberger entered; Rettenberger had carried the gun in his waistband; he had showed the gun to the victim; he had gone over the counter; he had hit the victim on the head a couple of times with the gun; the victim had tried to take the gun from him; he had talked to the victim; the victim had tried to run; Rettenberger fired three shots, aiming at the victim's shoulder; the first shot was fired and after approximately ten seconds two others were fired; he had not meant to kill the victim; two of those shots struck the victim; the two shots struck the victim in the shoulder; the victim was not shot in the head; the killing had not been "execution-style"; the bullet wounds should not have been fatal except that the bullet fragmented and struck the heart; the victim went down; Rettenberger ran out. Rettenberger was not the original source of any of these details.

¶ 41  At times, the information that the officers gave Rettenberger took the form of outright instructions or demands.

> DETECTIVE CORBIN: Who showed him the gun? Did you show him the gun?
>
> MR. RETTENBERGER: Did I?
>
> DETECTIVE CORBIN: Yeah. Now I'm telling you, you showed him the gun.
>
> MR. RETTENBERGER: Okay.

¶ 42  On many other occasions, Rettenberger simply incorporated the officers' suggestions into his confession. For instance, once the officers gave Rettenberger the names of his friends whom they were investigating, he then implicated those friends—and no others—in the crime. At several points in the interrogation, Rettenberger asked the officers for information about the crime, as when he asked (after he had already confessed to shooting the victim but before he was told that the victim was shot twice),

> MR. RETTENBERGER: Where did, where did the bullet hit at?
>
> MR. TIMOTHY: Well -
>
> MR. RETTENBERGER: Do you mind if I ask that?
>
> OFFICER TIMOTHY: Well, we'll tell you, but we kind of want to get an idea of where you was [sic] aiming at.

A similar exchange occurred (again after Rettenberger had confessed) when Detective Corbin asked him to draw them a picture of the gun used in the shooting:

> DETECTIVE CORBIN: Can you draw me kind of—you know, I don't care if it looks really good. Just so I have an idea.
>
> MR. RETTENBERGER: What was the caliber, anyways, of that gun?
>
> DETECTIVE CORBIN: You don't know?
>
> MR. RETTENBERGER: No, I really don't know.

¶ 43  When the officers changed the facts they had provided Rettenberger, his story also changed. For instance, on the first day when he was told that three people were

involved in the crime, he told the officers that all three entered the Motel 6 lobby. When, in the following interrogation, the officers told him that they knew he entered the lobby alone, he stated that he went into the lobby alone.

¶ 44    Early in the first interrogation, Rettenberger had told the officers,

> Okay, let—I'm going to tell you, I'm going to tell you just like this. I'll tell you, I'll say whatever you want me to say. I'll say I did this, I'll say I did that, I'll say whatever. I cannot tell you something that I don't know about.

By the close of the second day, the officers had directly or indirectly given Rettenberger virtually all the facts that he used in his confession.

■ ¶ 45   Full consideration of all the factors discussed above compels a determination that Rettenberger's confession was involuntary to the extent the record indicates that his will, already vulnerable due to certain known mental disabilities and deficiencies, was overborne by the suggestive and coercive techniques used by the interrogators, which exploited those very vulnerabilities. "In the face of a challenge to the voluntariness of a statement or confession, it is incumbent upon the prosecution to demonstrate by a preponderance of the evidence that the statement was made voluntarily based upon the totality of circumstances." *State v. Allen*, 839 P.2d 291, 300 (Utah 1992). In this case, the prosecution has failed to carry its burden. Reviewing the interrogation in light of the totality of circumstances, we conclude that Rettenberger's confession was induced by police coercion and was involuntary. Accordingly, we reverse the district court's denial of Rettenberger's motion to suppress and we remand this case to the district court for proceedings consistent with this opinion.

¶ 46    Chief Justice HOWE, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Associate Chief Justice DURHAM's opinion.

## Appendix

Detective Corbin: Do me a favor. Think about the house you was [sic] born in. Do you remember?

Mr. Rettenberger: In (inaudible)?

Detective Corbin: Yeah.

Mr. Rettenberger: I remember it.

Detective Corbin: Okay, how about the house in California that you last lived in (inaudible).

Mr. Rettenberger: Yeah?

Detective Corbin: Picture the front door, looking in. Let me see your eyes. Picture the front door. Do you see the front door?

Mr. Rettenberger: Yeah.

Detective Corbin: Okay. Now, you're standing in front of the door and you're going to go into the house. Is there a doorbell?

Mr. Rettenberger: Is there a doorbell?

Detective Corbin: Is there a doorbell to ring?

Mr. Rettenberger: At my house?

Detective Corbin: Uh-huh -

Mr. Rettenberger: Yeah.

Detective Corbin:—the house in California. Which side of the door it's on, is it on?

Mr. Rettenberger: Right.

Detective Corbin: Okay. As you go in the door what's the first thing that you see?

Mr. Rettenberger: I can't remember all that. That was four years ago. Probably a couch and a T.V.

Detective Corbin: Why don't you think about your bedroom for a minute? Do you remember your bedroom?

Mr. Rettenberger: Shared it with my little brother.

Detective Corbin: Okay.

Mr. Rettenberger: They're bunk beds.

Detective Corbin: As you walk through the door of your bedroom, which way does the door swing? Does it swing from right to left? Okay? Or from left to right?

Mr. Rettenberger: Four years ago, I can't remember which way my door opened. I don't know.

Detective Corbin: Which wall were your beds on?

Mr. Rettenberger: (inaudible) on this side.

Detective Corbin: Okay. Do me a favor for a minute here. I want you to think of an animal in your mind that has an elephant's body. Okay? An elephant that's got a different head on it. I want you to picture this for a minute. Okay? Okay, and you've got an elephant's body, and what I want you to do is put a giraffes neck on it. Okay? Can you picture that, and elephant's body, a giraffe's neck?

Mr. Rettenberger: Okay.

Detective Corbin: Bear with me. I know this is crazy, but bear with me. Okay. Now you've got the neck on this body, right?

Mr. Rettenberger: Okay.

Detective Corbin: Okay, look at me, let me see you. Okay? Now, on top of that giraffe's neck I want you to put an eagle's head.

Mr. Rettenberger: Okay.

Detective Corbin: Okay? You got it now?

Mr. Rettenberger: Yeah.

Detective Corbin: Picture what I'm looking at? Now what I want you to do is I want you to put some ostrich wings, you know those really short ones that they can't really fly on?

Mr. Rettenberger: Yeah.

Detective Corbin: Put some ostrich wings on the elephant.

Mr. Rettenberger: Okay.

Detective Corbin: Can you picture it? Okay. Now I want you to picture that thing walking through a great big pond of water. Can you picture it? What does the pond look like?

Mr. Rettenberger: It's just a pond, just water.

(At this point there is a break in the video tape. Testimony resumed as follows:)

Detective Corbin: We know what time you left this morning.