IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20090473-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (February 24, 2012) |
| Daniel Maestas, | ) | |
| | ) | 2012 UT App 53 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 081902497
The Honorable Vernice Trease

Attorneys:      Lori J. Seppi, Salt Lake City, for Appellant
                Mark L. Shurtleff and Karen A. Klucznik, Salt Lake City, for Appellee

-----

Before Judges Orme, Davis, and Roth.

ORME, Judge:

¶1      Defendant appeals from his convictions for automobile homicide, a second degree felony, *see* Utah Code Ann. § 76-5-207(3) (Supp. 2011); reckless driving, a class B misdemeanor, *see id.* § 41-6a-528 (2010); and possessing an open container in a motor vehicle, a class C misdemeanor, *see id.* § 41-6a-526(3).[1]  Defendant claims that the trial court erred in denying his motion to suppress; that he received ineffective assistance of

---

1. Defendant was charged under prior versions of these statutes.  Because there is no relevant difference between those versions and the current versions, we cite to the latter for the reader's convenience.

counsel; and that the cumulative errors in the proceedings should undermine our confidence that he received a fair trial. We are not persuaded and affirm.

BACKGROUND

¶2     At about 10:30 p.m. on February 21, 2008, Defendant and four friends met at a private club in Murray to celebrate a birthday. After drinking alcoholic beverages and otherwise enjoying their evening, the group left the club around 1:30 a.m. on February 22. Defendant and his friend, George, got into Defendant's Cadillac, while Defendant's other friends got into a rented Chevrolet. Video evidence showed that Defendant's friend, Alex, got into the driver seat of the Chevrolet, but there is no video evidence of who was driving the Cadillac.

¶3     After traveling down State Street in Murray, both the Cadillac and Chevrolet turned onto 5300 South. Heading west, the cars approached 4000 West in Kearns at speeds approaching 100 miles per hour. The cars then turned north on 4000 West and raced toward 4700 South. Defendant's Cadillac began to slide sideways after going over a canal crossing near 4750 South. Just past the intersection at 4700 South, the Cadillac's front right tire hit a curb, spinning the car counterclockwise. As the car spun, it hit two newspaper boxes, a stop sign, cement parking barriers, and two U-Haul moving trucks parked near a store. The car continued to spin, and the front passenger-side door struck the cement base of a light pole. The car ultimately came to rest on the west side of the road, facing north. All significant damage from the accident occurred on the passenger side of the vehicle; the driver side showed no damage from any external impact.

¶4     Neither Defendant nor George were wearing seatbelts. And not surprisingly, both were ejected from the Cadillac. Defendant was knocked unconscious as he landed on the pavement and sustained a minor cut to his head. Otherwise, he had no sign of external injury. George, however, died from injuries he sustained in the accident. So violent was the crash that blood and tissue from George's face were found on the passenger side of the car, the car's roof, and the light pole. Blood was also found on the passenger-side, but not the driver-side, air bag.

¶5     Emergency medical personnel arrived at the accident scene at 1:55 a.m. By then Defendant had regained consciousness. Upon examination, Defendant had normal vital signs, did not show any sign of being seriously injured, and did not indicate that he was

in pain.  Moreover, Defendant appeared alert and oriented, with a Glasgow coma score of 13-15.[2]  When asked by paramedics about what had happened, Defendant admitted that he had been at a party and had been drinking.  Defendant also told a paramedic that he had been driving the Cadillac.  Although Defendant showed no signs of serious injury, paramedics fitted Defendant with a neck brace and placed him on a back board.  He was then taken by helicopter to the trauma unit at the University of Utah Hospital.  At the hospital, tests revealed that Defendant had a broken vertebra in his neck but no other serious injury.  Defendant was subsequently given pain medication, but his Glasgow coma score remained at around 15.

¶6     While en route to the accident scene, Officer Jay Horner was redirected to the hospital to talk with Defendant.  Horner arrived at 3:03 a.m. and went to the emergency room.  Before talking with Defendant, Horner spoke with officers who had been at the accident scene.  The officers told Horner that they believed Defendant had been driving the Cadillac and was possibly intoxicated at the time of the accident.  Officer Horner was told "to speak with [Defendant] as a pre-arrest type conversation just to get his side of the story."

¶7     Officer Horner, in uniform and wearing his fully-equipped duty belt, approached Defendant while he was in one of the large individual rooms surrounding the nurses' station.  In the room, Defendant was not accompanied by a security guard, was not strapped to his bed, and was not otherwise physically restrained.  Defendant was, however, wearing a neck brace, connected to a catheter, and tethered to an IV.  Although family and friends were not allowed in the room, medical personnel came and went freely as Defendant spoke with Horner.  Officer Horner did not ask medical personnel what drugs Defendant had been given prior to interviewing him.[3]

¶8     After introducing himself, Officer Horner asked Defendant what had happened in the accident.  Horner made it clear to Defendant that he was not under arrest and that it was Defendant's option whether to speak with him.  Horner did not accuse Defendant of driving the Cadillac, nor did he tell Defendant that George had died.

---

2.  A Glasgow coma score measures the level of a patient's confusion.  A score of 15 indicates no confusion.

3.  Defendant had been given Fentanyl, a pain medication, prior to Officer Horner's interview with Defendant.  Defendant was later given Zofran, an anti-nausea drug; morphine, a pain medication; and Ativan, used to relieve anxiety.

During this interview, Horner "asked [Defendant] very minimal questions" about the collision and recorded some of Defendant's responses in a notebook. Defendant told Horner that he could not remember where he and George had been going or any details about the accident. Defendant told Officer Horner that he "only remembered driving the Cadillac."

¶9    While they spoke, Officer Horner noted that Defendant had slurred speech, smelled of alcohol, and otherwise appeared intoxicated. Horner also noted that Defendant's "demeanor was very aggressive" and that he "used profanity quite often." After the interview, Horner "just kind of hung out" with Defendant in the emergency room, although the two did not again interact significantly.

¶10   At about 5:00 a.m., Defendant was moved to a private room in another part of the hospital. Officer Horner accompanied Defendant to his new room. Although present in the room, Horner asked Defendant no further questions and could not even recall Defendant saying "one word" to him while there. The door to Defendant's room remained open, and medical personnel came and went the entire time Horner was present. Once out of the ER, Defendant was allowed visits by family members and received several visitors. Horner overheard Defendant tell one visitor, "I'm sorry, mom. Don't be mad at me." Later, after Defendant's cousin told him George died in the accident, Defendant said, "F**k, that's homicide," and while talking on the phone, Defendant explained to a friend that he had "f**ked up." Although he initially cried upon hearing that George had died in the accident, within a few minutes, Defendant turned "very jovial, flirtatious, joking and laughing." Officer Horner left Defendant's room at approximately 7:30 a.m.

¶11   Police continued investigating. Based on the physical evidence, Detective Darren Mower recreated the accident. From computer models, Mower concluded that George was in the front passenger seat and was ejected through the opening in the car created when the Cadillac collided with the light pole. The detective also concluded that Defendant had been driving at the time of the collision and had been ejected through the rear driver-side door as the car spun.

¶12   On February 26, 2008, Detective Mower went to the hospital to interview Defendant but learned that he had already been released. Mower then went to Defendant's home and spoke with him. The trial court found that Defendant refused to

talk with Detective Mower, but Mower testified at trial that he did in fact speak with Defendant at that time.[4]

¶13    In April 2008, Defendant was arrested and charged with automobile homicide, reckless driving, and an open container violation. Prior to trial, Defendant moved to suppress statements he made at the hospital, contending both that he had been subject to custodial interrogation without being given *Miranda* warnings and that his statements were involuntary. The trial court denied Defendant's motion.

¶14    During the preliminary hearing, attorney Manny Garcia entered an appearance as counsel for Defendant. At some point during his representation of Defendant, Garcia passed Alex in the court's detention area. Garcia stopped Alex and asked, "Who was driving the other car?" Alex answered simply: "George." Shortly after this conversation, Garcia withdrew, and new defense counsel entered an appearance.

¶15    Alex was also charged with various crimes growing out of the events that culminated in the fatal accident. Alex and Defendant were set to be tried jointly. On the morning of trial, defense counsel filed a motion to sever so she could call Alex to testify in Defendant's case. Alex, however, announced through counsel that he would invoke the Fifth Amendment. Defense counsel then sought to call Garcia to testify as to Alex's statement to Garcia, claiming it should be admitted under rule 804 of the Utah Rules of Evidence because Alex was unavailable to testify, having invoked his Fifth Amendment right. *See* Utah R. Evid. 804. The State argued that although Alex was unavailable, rule 804 did not apply because Alex's one word statement was not "contrary to [Alex's] pecuniary or proprietary interest." *See id.* R. 804(b)(3). The trial court agreed with the State and precluded Garcia from testifying as to Alex's statement. Following a jury trial, Defendant was convicted of all charges.


ISSUES AND STANDARDS OF REVIEW

¶16    Defendant first claims that the trial court erred in denying his motion to suppress. "We review the trial court['s] factual findings underlying the denial of a motion to suppress for clear error," *State v. Brandley*, 972 P.2d 78, 81 (Utah Ct. App. 1998) (alteration in original) (citation and internal quotation marks omitted), while we

---

4. The State concedes that the trial court's finding is clearly erroneous.

review a trial court's ensuing conclusions of law for correctness, *see State v. Moreno*, 910 P.2d 1245, 1247 (Utah Ct. App.), *cert. denied*, 916 P.2d 909 (Utah 1996).

¶17    Defendant also argues that he received ineffective assistance of counsel. Where an "ineffective assistance claim is first raised on direct appeal, this court can only determine that the defendant was denied effective assistance of counsel if it can do so as a matter of law." *State v. Snyder*, 860 P.2d 351, 354 (Utah Ct. App. 1993).

¶18    Finally, Defendant argues that his convictions should be reversed because of cumulative error. "The cumulative error doctrine allows us to consider all errors and 'reverse only if the cumulative effect of the several errors undermines our confidence' that [Defendant] received a fair trial." *State v. King*, 2010 UT App 396, ¶ 17, 248 P.3d 984 (citation omitted).


ANALYSIS

I.  Motion To Suppress

¶19    Defendant argues that the trial court erred in denying his motion to suppress. First, Defendant argues that the trial court's decision is flawed because "[s]everal of the findings [of fact] in support of denying the motion were clearly erroneous." Next, Defendant contends that his statements at the hospital should have been suppressed because they were not offered voluntarily. Finally, Defendant contends that the statements were obtained through custodial interrogation without the benefit of *Miranda* warnings. We address each issue in turn.

A.  Findings of Fact

¶20    Defendant first contends that several of the trial court's findings were clearly erroneous. "A court's findings are clearly erroneous if the findings are against the clear weight of the evidence, or if [we are] convinced that a mistake has been made." *In re T.M.*, 2006 UT App 435, ¶ 14, 147 P.3d 529 (citations and internal quotation marks omitted).

¶21    With the exception of one inconsequential finding, we conclude that the trial court's findings are not clearly erroneous. First, Defendant contends that the trial court's findings underlying its conclusion that Defendant was not in custody are clearly

erroneous. Specifically, Defendant notes that the trial court found that Defendant "was not restrained," despite evidence that he was tethered to a catheter and an IV while in the emergency room. This finding is not clearly erroneous when considered in context. The trial court was no doubt referring to the fact that Defendant was not restrained *by Officer Horner* even though his movement was restricted by tubes installed by hospital staff for valid medical reasons. Likewise, Defendant claims the court erred in finding that "there was no restriction on access" to Defendant. While it is true that Defendant could not receive visitors in the emergency room, apparently in accordance with hospital policy rather than any action taken by Horner, he received them freely once transferred to his private room. The court's finding, while somewhat generalized, thus appears to be accurate. Accordingly, we see no error in the findings underlying the court's conclusion that Defendant was not restrained.

¶22 Next, Defendant labels as erroneous the court's finding that "Officer Horner asked questions of [Defendant], and the answers were written down by Officer Horner in his notebook." Defendant contends that this finding is erroneous because Officer Horner only wrote down select answers and did not make a verbatim record. Because we do not take the finding to mean that Officer Horner's notes were precise transcripts of the interview, we see no error here. Likewise, Defendant claims that the court's finding that Defendant "admitted to driving the vehicle" is incomplete because Defendant's statement giving rise to that finding was not recorded verbatim. Whether a finding is incomplete is not the same as it being clearly erroneous. And indeed, incomplete though it may be, sufficient evidence supports the court's finding that Defendant admitted to Officer Horner that he, Defendant, had been driving the Cadillac at the time of the accident. Thus, we reject these arguments.

¶23 Further, Defendant asserts that the court's finding that he "was coherent and gave reasonable answers" is erroneous because it failed to give sufficient weight to the effects of trauma, alcohol, and medication on Defendant. We see ample evidence in Officer Horner's testimony that Defendant was indeed coherent and gave reasonable responses to Officer Horner's questions. This evidence is buttressed by Defendant's Glasgow coma scores. In any event, Defendant's argument for this point consists merely of his speculation about how trauma, alcohol, and medication might have affected him. Thus, we will not disturb this finding.

¶24 Finally, Defendant challenges the court's finding that Detective Mower did not speak with Defendant when he went to Defendant's home a few days after he was released from the hospital. The State concedes that Defendant did in fact speak with

Detective Mower on that occasion.  While this finding is inaccurate, it is also irrelevant.  Indeed, whether Defendant actually spoke with Mower days after the accident has no bearing on whether Defendant's statements in the hospital were voluntary or whether Defendant was in custody while being interviewed in the emergency room.  Thus, despite this inaccuracy, the trial court's other findings and basic analysis are not tainted by it.  *See, e.g.*, *State v. Bredehoft*, 966 P.2d 285, 292 n.7 (Utah Ct. App. 1998) (explaining that although a finding may have been clearly erroneous, it was not important to the disposition of the case because it was irrelevant to the court's analysis of the issue), *cert. denied*, 982 P.2d 88 (Utah 1999).  Thus, with one inconsequential exception, the trial court's findings are not clearly erroneous, and we take them as our starting point in considering Defendant's legal arguments.

B.  Voluntariness

¶25    Defendant contends that his statements either made to or overheard by Officer Horner at the hospital were involuntary and thus in violation of his rights under the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.  We conclude that Defendant's statements were not constitutionally involuntary.

¶26    The Fifth Amendment to the United States Constitution "protects individuals from being *compelled* to give evidence against themselves."  *State v. Rettenberger*, 1999 UT 80, ¶ 11, 984 P.2d 1009 (citations and internal quotation marks omitted).  Additionally, under the Due Process Clause of the Fourteenth Amendment "'certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.'"  *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)).  When statements made by a defendant are "constitutionally involuntary," they are suppressed.  *See Rettenberger*, 1999 UT 80, ¶ 18.

¶27    In assessing a defendant's challenge, we "examine the totality of circumstances to determine whether a confession ha[s] been made freely, voluntarily and without compulsion or inducement of any sort."  *Id.* ¶ 14 (citations and internal quotation marks omitted).  "[T]he totality of circumstances [includes] both the characteristics of the accused and the details of the interrogation."  *Id.* (alterations in original) (citation and internal quotation marks omitted).  Our Supreme Court has recognized several objective factors, none of which alone is dispositive, as relevant to the "totality of circumstances test," including "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made

to the defendant by the officers." *Id.* Additionally, the Court has identified personal factors to be considered, including "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15.

¶28    We note that although a defendant's personal characteristics are relevant to our analysis, "a defendant's mental state *alone*" is insufficient to "render a confession constitutionally involuntary." *Id.* ¶ 18 (emphasis added). *See also Connelly*, 479 U.S. at 165 ("[M]ere examination of the confessant's state of mind can never conclude the due process inquiry."). Indeed, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167. *See also id.* at 165 (noting there must be a "link between coercive activity of the State, on the one hand, and a resulting confession by a defendant on the other"). And while exploitation of a defendant's mental deficiency may constitute coercive police activity, *see Rettenberger*, 1999 UT 80, ¶ 18 ("[A] confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession."), before a statement may be found to be constitutionally involuntary, the evidence must reveal that a police officer used "some physical or psychological force or manipulation . . . designed to induce the accused to talk when he otherwise would not have done so," *id.* ¶ 25 (citations, internal quotation marks, and emphasis omitted).

¶29    Relying on and quoting from *Rettenberger*, Defendant contends that his "'will, already vulnerable due to' intoxication, injury, pain, trauma, and medication, 'was overborne by the suggestive and coercive techniques used by [Officer Horner], which exploited those very vulnerabilities.'" *See id.* ¶ 45. We turn to the factors identified by our Supreme Court to determine whether there was a "causal relationship between the [alleged] coercion and the subsequent" statements made by Defendant at the hospital. *State v. Mabe*, 864 P.2d 890, 893 (Utah 1993).

1. Objective Factors

¶30    We first look at Officer Horner's activity from an objective standpoint to determine whether it was coercive. We analyze both Officer Horner's questioning of Defendant in the emergency room and his conduct in Defendant's private room.

¶31    Officer Horner approached Defendant as medical personnel treated him in the hospital emergency room. The interview between Defendant and Officer Horner lasted approximately fifteen minutes—a marked difference from the prolonged interrogation

in *Rettenberger*, which involved one to two-and-a-half hours of questioning over the course of two days. *See* 1999 UT 80, ¶ 33 . Moreover, Officer Horner was not persistent during the interview. Indeed, it appears that Horner "asked [Defendant] very minimal questions" and merely attempted to "get [Defendant's] side of the story." We have no indication that Officer Horner raised his voice, repeatedly asked Defendant the same questions, or badgered Defendant in any way. Thus, we see nothing in the duration or manner of questioning during the initial interview to suggest coercion.

¶32    Further, we see no evidence that Officer Horner used trickery, deception, or threats to elicit a response from Defendant. Defendant contends that Officer Horner's questioning was deceptive because he failed to inform Defendant about the seriousness of the accident. Specifically, Defendant contends that had Horner informed him that the police believed that he was the driver of the Cadillac and that his friend George had died in the accident, it might have helped "sober" him. We see no indication that Officer Horner's failure to inform Defendant that he was the suspected driver and that George had died as a result of the crash was an attempt by Horner to misrepresent the situation Defendant faced or to somehow subtly induce him into revealing incriminating information. In any event, Defendant has cited no authority indicating that an officer's failure to bring a suspect up to speed on all the underlying facts and circumstances, where that failure does not rise to the level of misrepresentation, constitutes "police trickery" sufficient to render a defendant's statements involuntary.[5]

¶33    We recognize that while Defendant was in the emergency room area his family and friends were not allowed access to him. Defendant was also connected to medical equipment and was expected to remain immobile in the room while recuperating. Defendant's isolation from family and friends and his decreased mobility are certainly relevant when assessing the voluntariness of his statements. *See Rettenberger*, 1999 UT 80, ¶¶ 14, 33. Nevertheless, we are not convinced in this case that Defendant's isolation

---

5. Defendant also faults Officer Horner for failing to record the interview verbatim and denying him "the opportunity to write a confession" or to see Officer Horner's notes "so that [Defendant] could review and sign them." We do not see how Horner's failure to record the interview or give Defendant an opportunity to write a confession constituted force or manipulation "designed to induce [Defendant] to talk when he otherwise would not have done so." *See State v. Rettenberger*, 1999 UT 80, ¶ 25, 984 P.2d 1009. Indeed, any imprecision by Officer Horner in recording the interview touches on the evidentiary value of Horner's testimony at trial, not the voluntariness of Defendant's statement. *See Colorado v. Connelly*, 479 U.S. 157, 159 (1986).

and decreased mobility establish that he was coerced into making involuntary statements.  Officer Horner did not cause Defendant to be isolated from his friends and family or to be connected to medical equipment.  Hospital policy and medical treatment, not police tactics, caused Defendant's isolation and lack of mobility, and Officer Horner had no control over those circumstances.  Indeed, it may fairly be said that Defendant was subject only to medical restraint, not police restraint.  Thus, the traditional concern associated with police isolation and restraint—specifically, that police will condition a defendant's freedom of movement upon his cooperation with the investigation, *see Haynes v. Washington*, 373 U.S. 503, 514 (1963)—is simply not present here.  Whether or not he chose to speak with Officer Horner, Defendant would not have become free to leave or move about as he saw fit.  And in any event, Defendant, though not permitted visitors while in the emergency room area, was not truly isolated.  The door to the large room in which he rested remained open throughout the interview, and hospital personnel freely entered and exited as they deemed necessary.  Accordingly, although he may have been isolated and confined to some degree, these circumstances, in context, are not an objective indication that Officer Horner coerced Defendant.

¶34    Of even less concern are Defendant's statements made after the initial fifteen minute interview, once Defendant had been transferred from the emergency room to his private room.  After the initial interview concluded, Officer Horner "just kind of hung out" with Defendant.  Although Officer Horner spent several hours with Defendant in the hospital, there is no indication that Officer Horner used any threats, trickery, or other coercive tactics at any point.  Indeed, it appears that Officer Horner merely sat in Defendant's room and that the two did not communicate in any meaningful way.[6]  We fail to see how Officer Horner's mere presence in these two rooms was objectively coercive.  *See, e.g., United States v. Zamoran-Coronel*, 231 F.3d 466, 469 (8th Cir. 2000) ("[T]he mere presence of some police officers in a confined space does not necessarily exert coercion of a constitutionally-defective nature.").

¶35    Accordingly, we conclude that there is no objective indication that Officer Horner engaged in coercive conduct designed to overcome Defendant's free will.

---

6. There is no suggestion in the record that medical personnel asked Officer Horner to leave out of concern his presence was having adverse effects on Defendant's mental state or ability to rest.  And there is no suggestion Defendant asked him to leave—or asked his nurse or treating physician to ask him to leave—because of the intrusion on his privacy.

## 2. Personal Factors[7]

¶36    We recognize that although Officer Horner did not *objectively* engage in coercive tactics, we must still examine whether Defendant's "subjective characteristics, *especially as known to [Officer Horner]*, . . . made [Defendant] more susceptible to manipulation," *Rettenberger*, 1999 UT 80, ¶ 37 (emphasis added).  Specifically, it may be that Officer Horner's tactics become coercive or suggestive when Defendant's personal characteristics are taken into account, *see id.,* and indeed, this appears to be the main thrust of Defendant's argument on appeal.  In line with *Rettenberger*, it is true that an officer's knowledge of subjective mental infirmities could make the officer's actions sufficiently coercive, if there is evidence that he has exploited them.   *See id.*  We take these points in turn, considering first whether Officer Horner knew of Defendant's alleged limitations and, second, whether Officer Horner exploited them.

¶37    Defendant contends that Officer Horner knew that Defendant had been in a serious accident, was intoxicated, suffered from memory loss, and became "highly agitated" at the hospital.  Additionally, Defendant also notes that Officer Horner neglected to ask medical personnel about Defendant's condition.  Accordingly, Defendant argues, by failing to postpone the interview until Defendant had recovered from the accident, Officer Horner "exploit[ed Defendant's] mental deficiencies."  We are not convinced that Officer Horner knew of and exploited Defendant's alleged vulnerability, i.e., the effects of his having been in a traumatic accident, being intoxicated, experiencing mood swings, and having taken medication.

---

7. The Utah Supreme Court has expressly rejected an application of *Colorado v. Connelly*, 479 U.S 157 (1986), that focuses entirely on an objective analysis of police conduct.  *See Rettenberger*, 1999 UT 80, ¶ 17, 984 P.2d 1009 ("[W]e believe that *Connelly* stands for the limited proposition that a defendant's mental condition is not in itself sufficient to make a confession involuntary.").  Accordingly, our Supreme Court has recognized that a defendant's unique personal characteristics might make him more susceptible to manipulative conduct.  *See id.* ¶ 37.  Nevertheless, we reemphasize that a defendant's mental state alone is never sufficient, without more, to support a conclusion that a statement is involuntary.  *See Connelly*, 479 U.S. at 165.  Indeed, we note that "the term 'involuntary' should be construed to refer not to some property a defendant's confession may be said in itself to have or lack, but rather to a certain relation between the confession and the method or conduct of law enforcement officials in procuring it." *United States v. Newman*, 889 F.2d 88, 95 n.3 (6th Cir. 1989) (emphasis omitted), *cert. denied*, 495 U.S. 959 (1990).

¶38     To begin, it is not clear that Officer Horner knew that Defendant had a compromised mental state, particularly in the emergency room during the interrogation. We acknowledge that Horner knew that Defendant had been in a car accident, showed signs of pain and agitation, may have been intoxicated, and had received medical treatment. Defendant was at times angry and used profanity directed toward hospital staff and Officer Horner. But Defendant's anger in the emergency room does not appear to be all that uncommon. Specifically, we note that pain produces different reactions in people, including anger and agitation. Some individuals use profanity with great frequency, and perhaps more so when in uncomfortable situations such as the one in which Defendant found himself. Defendant's use of profanity is not necessarily uncommon, especially considering that he had been drinking. It may even be that Defendant's anger and profanity are actually indications that he was *not* coerced by Officer Horner but was acting with unrestrained freedom. Defendant's anger and profanity, then, were not clear signals to Officer Horner that Defendant had a diminished mental or emotional state that Horner could exploit during the interview.

¶39     Further, we conclude that Horner's knowledge of Defendant's intoxication did not put him on notice that Defendant was incapable of making a voluntary statement. We note that "[s]imply because [a defendant] was under the influence of drugs [or alcohol] does not automatically render his confession involuntary." *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008). While Defendant's speech was slurred, there is no sign that Defendant's intoxication was so severe that he was unable to understand and answer questions appropriately or otherwise communicate effectively. Indeed, testimony revealed that Defendant was not "out of it"; rather, he was "very coherent" and "gave [Officer Horner] reasonable answers." Thus, Defendant's intoxication did not necessarily give Officer Horner knowledge of Defendant's allegedly deficient mental state.

¶40     Although Defendant had taken pain medication prior to the interview in the emergency room, which medication he alleges could have caused confusion, dizziness, drowsiness, and anxiety, Horner was not aware of this. We are not convinced that Horner should have inquired about the medication Defendant had been given prior to the interview, much less that the hospital would have provided that information had he

requested it.[8]  Defendant also contends that, in addition to failing to make a medication inquiry, it was improper for Horner not to have inquired as to Defendant's general medical condition prior to asking him questions.  A police officer is not routinely required to inquire into a defendant's medical condition prior to questioning him.  *See generally United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (noting that police did not act improperly in questioning an intoxicated and sleep-deprived defendant because, in part, the investigating officer was not aware that the defendant had recently used methamphetamine and gone without sleep for five days), *cert. denied*, 499 U.S. 941 (1991).  This is especially true of those injured in auto accidents, with which most police officers will have extensive experience and a meaningful frame of reference, and thus less need to seek guidance about the effects of trauma.  In contrast, an officer may have a duty to inquire about a defendant's mental state if the defendant exhibits truly bizarre behavior.  But such was not the case here.  Defendant gave Officer Horner "reasonable answers" and his "statements were reasonable."  Thus, Horner had no notice that Defendant's mental state warranted special concern.

¶41    Indeed, taking into account all of the factors that Defendant alleges contributed to his mental state, but discounting entirely his speculation about the effects of his medication, intoxication, and stress, there is little indication that Officer Horner knew of Defendant's supposedly deficient mental condition.  Officer Horner's lack of information weighs heavily against a finding that he somehow exploited or otherwise took advantage of Defendant's mental state during the interview.  *See State v. Rettenberger*, 1999 UT 80, ¶ 37, 934 P.2d 1009.

¶42    Next, even if Officer Horner knew of Defendant's precise mental state, we do not see any evidence that Horner's objectively noncoercive interview techniques overcame Defendant's free will because of Defendant's subjective state while in the emergency room.  In *Rettenberger*, the Utah Supreme Court held that a defendant had been exploited by police coercion where he lacked experience with the judicial system, had attention deficit disorder, and exhibited signs of depression, anxiety, and other mental deficiencies.  *See id.* ¶¶ 37, 45.  Key to the Court's conclusion that the defendant's interrogation was constitutionally impermissible was its determination that the defendant's mental deficiencies made him "more susceptible to stress and coercion than the average person."  *Id.* ¶ 38 (internal quotation marks omitted).  This susceptibility manifested itself when the defendant seemingly took his cues from police officers and

---

8. Applicable patient privacy laws and hospital privacy regulations may well have prevented hospital personnel from sharing this information with Officer Horner.

eventually "incorporated the officers' suggestions into his confession." *Id.* ¶¶ 39-44. Indeed, the Court concluded that "the officers had directly or indirectly given [the defendant] virtually all the facts that he used in his confession." *Id.* ¶ 44.

¶43     In sharp contrast to the defendant in *Rettenberger*, Defendant here does not seem to have been made susceptible to Officer Horner's questioning because of his mental condition. Indeed, none of Defendant's incriminating statements appear to have been supplied or suggested to Defendant by Horner. The key piece of evidence—the identity of the driver of the vehicle—was not mentioned, as noted above, by Officer Horner at any point during the interview. Additionally, Defendant's story did not change during his hospital stay, and his statements were consistent with the accident-scene evidence suggesting that he was the driver of the Cadillac. Thus, unlike the defendant in *Rettenberger*, we see no indication that Defendant's mental condition caused him to be more susceptible to Horner's questioning.

¶44     Defendant also relies on *Mincey v. Arizona*, 437 U.S. 385, 399-401 (1978), in arguing that his confession was involuntary because of his allegedly vulnerable state at the hospital. This case is easily distinguished from *Mincey*. In *Mincey*, the "barely conscious" defendant "depressed almost to the point of coma," who was "seriously and painfully wounded . . . [and] on the edge of consciousness," repeatedly informed the investigating officer that he did not want to answer questions because he was unable to think clearly. *Id.* at 398-401. Despite the defendant's "entreaties to be left alone," the officer "relentlessly" engaged the defendant in "virtually continuous questioning." *Id.* at 401. Accordingly, the Court found the statements were "not the product of [the defendant's] free and rational choice." *Id.* at 401-02 (citation and internal quotation marks omitted).

¶45     Here, in contrast, Defendant does not appear to have been in as serious a condition as the "barely conscious" defendant in *Mincey*. Moreover, we see no evidence that Officer Horner ignored an indication from Defendant that he did not wish to talk or that the officer engaged in "relentless" or "virtually continuous" questioning. Indeed, it appears that Officer Horner "asked [Defendant] very minimal questions" and that Defendant "was very coherent" and "gave [Horner] reasonable answers." We see no other indication that Defendant's subjective characteristics made him "particularly vulnerable," "overly compliant," or unusually sensitive to Horner's questioning. *See Rettenberger*, 1999 UT 80, ¶ 37. Thus, we are not convinced that Officer Horner's objectively reasonable interrogation can be considered exploitative even when considered in light of Defendant's personal characteristics and circumstances.

¶46    Finally, while Defendant did take more medication after the initial interview and exhibited mood swings while in his private room, we note that Officer Horner was apparently unaware of the combination of medications that Defendant had been given. Nevertheless, although Officer Horner remained aware that Defendant was in pain and had been involved in a traumatic accident in which his friend had died, there is no indication that Horner exploited Defendant's mental condition in the private room. Specifically, Horner appears to have merely sat in the room while Defendant rested, received visitors, made phone calls, and was attended by hospital staff. Officer Horner testified that he did not say much, if anything at all, to Defendant after the fifteen-minute interview concluded and that he said nothing while in the private room. Indeed, it appears Horner essentially fulfilled the role of the proverbial fly on the wall. We cannot see how Officer Horner's mere presence would have constituted exploitative conduct causally linked to the incriminating statements Defendant made while in the private room.

¶47    In sum, we conclude that Officer Horner did not engage in coercive conduct from an objective standpoint. Moreover, we are not convinced that Horner knew or should have known that Defendant had an allegedly deficient mental state. In any event, we see nothing that suggests Horner exploited Defendant's personal condition or characteristics while at the hospital. Thus, we see no error in the trial court's decision not to suppress Defendant's hospital statements as involuntary.

C. Custodial Interrogation

¶48    Defendant also contends that the trial court erred when it denied his motion to suppress because he was not given *Miranda* warnings prior to being questioned by Officer Horner in the emergency room. A person is entitled to *Miranda* warnings prior to being subjected to custodial interrogation. *See State v. Gallegos*, 2009 UT 42, ¶ 25, 220 P.3d 136 (citing *State v. Levin*, 2006 UT 50, ¶¶ 33-34, 144 P.3d 1096 ). "[C]ustodial interrogation occurs where there is both (1) custody . . . and (2) interrogation." *Levin*, 2006 UT 50, ¶ 34. Where an individual is subject to custodial interrogation and not given *Miranda* warnings, any statement made by that individual is inadmissible at trial. *See State v. Ferry*, 2007 UT App 128, ¶ 12, 163 P.3d 647. Here, the State concedes that Defendant was subject to interrogation while in the emergency room and that he was

not given the *Miranda* warnings.[9] Thus, whether Defendant's hospital statements should have been suppressed turns on whether he was in "custody."

¶49    "A person is in custody when '[the person's] freedom of action is curtailed to a degree associated with formal arrest.'" *Levin*, 2006 UT 50, ¶ 35 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (alteration in original). Whether this standard is met "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam).

¶50    The Utah Supreme Court has identified four factors that aid in determining whether a person is in custody for *Miranda* purposes: "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983). No one factor is dispositive, and we look to the totality of the circumstances in making our determination. *See State v. Worthington*, 970 P.2d 714, 716 (Utah Ct. App. 1998).

¶51    We conclude that Defendant was not in custody when he spoke with Officer Horner in the emergency room. As to the site and circumstances of the interrogation, we note that Defendant was in a large patient room in the hospital's emergency room area. He was hooked to a catheter and an IV and was expected to remain in his hospital bed while he recuperated. Yet Defendant was not otherwise confined to his hospital bed, and he "had full movement in his arms and legs," despite his injured and braced neck. It is also true that Defendant was not able to receive visitors in the emergency room. However, the door to his room remained unlocked and open, and medical personnel continued to treat Defendant while he spoke with Officer Horner. In any event, as we mentioned in the context of analyzing police coercion, while Defendant may have been confined and isolated to a degree, this was the result of medical treatment rather than Officer Horner's interrogation. Defendant was, in a sense, in medical custody, not police custody. It has been noted that "the restrictions on [a person's] freedom arising from police interrogation and those incident to his background circumstances" must be carefully separated. *United States v. Jamison*, 509

---

9. There was no interrogation after the initial fifteen-minute interview. Indeed, it appears that after Officer Horner questioned Defendant in the emergency room, the two did not again interact significantly. Thus, our focus is on the interrogation that took place when Horner interviewed Defendant in the emergency room.

F.3d 623, 629 (4th Cir. 2007). Accordingly, we do not assume an individual is in custody for *Miranda* purposes when his confinement and isolation are the result of medical treatment and not police interrogation. *See, e.g., id.* (concluding that restraint because of injury and medical exigencies at a hospital did not factor into the court's custody analysis). Thus, we do not factor Defendant's confinement and isolation into our analysis because they were the result of medical treatment and not Officer Horner's actions.[10]

¶52 The second factor, the focus of the investigation, also does not weigh in favor of finding that Defendant was in custody. Defendant contends that he was the sole focus of the investigation because he was the only surviving passenger and the only person transported to the emergency room after the accident. Nevertheless, although Officer Horner was aware that Defendant was suspected of being the driver of the Cadillac, he did not indicate to Defendant that he was under suspicion for any crime. And, we note, "an officer's unarticulated subjective focus on a particular suspect is not relevant to the determination of whether that suspect is in custody for *Miranda* purposes." *State v. Mirquet*, 914 P.2d 1144, 1148 (Utah 1996).

¶53 Further, Defendant contends that Officer Horner delayed arresting Defendant at the hospital to avoid having to give Defendant *Miranda* warnings in hopes that he would confess. *See United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1986) (stating that under some circumstances police presence and close monitoring of a defendant at the hospital could indicate that the defendant was in custody). We note that despite Defendant's statements to Officer Horner confirming that he was driving the Cadillac at the time of the accident, Defendant was not arrested for over a month after he left the hospital. It appears that the police investigation, including accident reconstruction and computer modeling, continued during this time. Thus, we are not convinced that the

---

10. Defendant also argues that the fact the questioning took place "in the middle of the night" points to his being the subject of custodial interrogation. In support of this position he cites to *State v. Gallegos*, 2009 UT 42, 220 P.3d 136, in which the Court observed that a public clubhouse took "on an isolated character" when questioning took place "at four o'clock in the morning." *Id.* ¶ 27. We note, however, that hospitals are places of constant activity regardless of the time of day. Thus, unlike a public clubhouse, which likely has few, if any, patrons at four o'clock in the morning, a hospital's emergency room during the same period of time would not take on the same kind of isolated character, as was the case here given that medical personnel were freely entering and exiting Defendant's room during the interview.

evidence suggests that the officers "deliberately delayed making a formal arrest" to avoid *Miranda*. *See id.* On the contrary, it appears that the delay in arresting Defendant was attributable to a commendable interest on the part of the police in completing their investigation and making sure that other evidence pointed to Defendant. Consequently, we conclude there was no undue focus on Defendant by Officer Horner so as to suggest that Defendant was in custody.

¶54    The third factor, the objective indicia of arrest, also weighs against a finding that Defendant was in custody. Specifically, Officer Horner was the only officer present in the emergency room. There is no indication that the location in which Officer Horner positioned himself a "couple of feet" from Defendant's bed was in any way threatening or menacing. Moreover, while Defendant was confined to his hospital bed because of the catheter and IV, this was not the result of Officer Horner's efforts to hold him, but the result of medical treatment. *See State v. Gallegos*, 2009 UT 42, ¶ 29, 220 P.3d 136 (focusing on police wrongdoing in determining whether the defendant was in custody). Additionally, Officer Horner did not close the door to the hospital room during the interview, and he repeatedly informed Defendant that he was not under arrest.[11] Finally, although Horner was dressed in uniform, including his duty belt with firearm and handcuffs attached, he did not brandish his gun when speaking with Defendant or suggest he would make use of his handcuffs. The mere fact that a police officer has a duty belt with a "visible firearm" and handcuffs attached is not a sufficient indicium of arrest to demonstrate that the Defendant was in custody.[12] Thus, we are not convinced that *any* objective indicia of arrest were present.[13]

---

11. Defendant contends that although Officer Horner told him he was not under arrest, his injury and the drugs "left [Defendant] unable to understand or remember this fact." We again note that custody is viewed, almost without exception, from an objective standpoint. *See Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam) (emphasizing the objective nature of the *Miranda* inquiry).

12. Indeed, because of how unremarkable it is for police officers to wear duty belts with firearms and handcuffs attached, we do not consider an officer's merely wearing such a belt during a police interview to be an indicium of arrest at all.

13. Defendant also includes as an indicium of arrest the fact that Officer Horner "kept [Defendant] under constant supervision." We note, however, that this supervision occurred solely after the fifteen-minute interview had ceased. Thus, this "supervision,"

(continued...)

¶55    Finally, the length and form of the questioning weigh against a finding that Defendant was in custody. The questioning "lasted approximately 15 minutes"—a brief period of time as police interrogation goes. During those fifteen minutes, Officer Horner never told Defendant that he was required to speak with him. More importantly, after the questioning began, Officer Horner "asked [Defendant] very minimal questions." And those questions were merely "investigatory, not accusatory" in nature. Consequently, we see nothing in the facts indicating that the form of Horner's questions was designed to compel Defendant to confess, as he contends.

¶56    Accordingly, we are not convinced that any of the factors identified by our Supreme Court in *Carner* weigh in favor of concluding that Defendant was in custody when questioned by Officer Horner in the emergency room. Thus, the trial court did not err in refusing to suppress Horner's testimony despite Defendant not receiving *Miranda* warnings.

## II. Ineffective Assistance of Counsel

¶57    Defendant also contends that he received ineffective assistance of counsel in the proceedings below because, he alleges, his trial counsel (1) failed to investigate or present evidence on the effects of his injury, trauma, and medication on his mental state while at the hospital and (2) failed to properly handle Alex's statement that George had been driving the Cadillac. To establish ineffective assistance of counsel, a defendant must show that (1) "counsel's performance was deficient in that it 'fell below an objective standard of reasonableness'" and (2) "counsel's performance was prejudicial in that 'there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Menzies v. Galetka*, 2006 UT 81, ¶ 87, 150 P.3d 480 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

### A. Defendant's Injury, Trauma, and Medication

¶58    Defendant complains that his counsel failed to investigate or present evidence regarding the effects of the medication Defendant was given at the hospital. We are not convinced, even assuming that Defendant's counsel's performance fell below an

---

13. (...continued)
even if properly considered an indicium of arrest, did not occur while Defendant was being interrogated, and therefore is not relevant to our *Miranda* analysis, which is focused on whether Defendant was the subject of custodial interrogation.

objective standard of reasonableness, that there is a reasonable probability that the suppression hearing would have turned out differently.

¶59 We acknowledge that there is no evidence that Defendant's counsel sought to discover the potential effects of the injury, trauma, and medicine on Defendant while he recovered in the hospital. We do not doubt that these factors could have caused confusion, mood swings, or other mental ramifications. Nevertheless, even if Defendant's counsel had investigated the effects of the injury, trauma, and medication and had shown that Defendant in fact had a diminished mental state—no small undertaking, to be sure—this would *not* have established that Officer Horner knew of Defendant's weakened mental state or proved that Horner exploited that vulnerable condition. And as we have explained above, demonstrating police coercion is a "necessary predicate" to prevail on an involuntariness claim. *See supra* ¶ 28. Accordingly, even with evidence regarding the potential effects of the trauma, injury, and medication, Defendant would not have succeeded on his involuntariness claim. Likewise, because whether a defendant was in custody is an objective determination, *see Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam), evidence regarding Defendant's subjective state would have been irrelevant to the court's *Miranda* analysis. Thus, even assuming Defendant's counsel should have investigated the effects of Defendant's injury, trauma, and medication, the result of the suppression hearing would not have been different.

B. Alex's Statement

¶60 Defendant next argues that his counsel rendered deficient performance by failing to call his codefendant Alex to the witness stand, thereby making Alex invoke his Fifth Amendment privilege against self-incrimination. Had his counsel called Alex to testify and forced him to invoke his privilege, Defendant contends, his counsel would then have been able to introduce Alex's statement, in which he allegedly identified George as the driver of the Cadillac, either as a prior inconsistent statement, *see* Utah R. Evid. 801(d)(1)(A), or as a statement against interest, *see id.* R. 804(b)(3).

¶61 We are not convinced that Defendant could have called Alex to the stand and required him to invoke his Fifth Amendment privilege against self-incrimination. It is fundamental that in a criminal trial, a defendant may not be "compelled . . . to be a witness against himself." U.S. Const. amend. V. *See also State v. Kazda*, 540 P.2d 949, 951 (Utah 1975) ("It is not to be doubted that the right of a defendant not to testify in a criminal trial is a fundamental right protected by both the federal and the Utah Constitutions."). The protection of the Fifth Amendment has been read expansively,

and "[t]he privilege entitles the criminal defendant . . . to even avoid appearing as a witness" in his own trial. Wayne R. LaFave et al., Criminal Procedure § 24.5(a) (3d ed. 2007). It is likewise fundamental that a defendant's invocation of his privilege against self-incrimination "should in no way prejudice him in the eyes of the court or jury." *Kazda*, 540 P.2d at 951. *See also State v. Travis*, 541 P.2d 797, 799 (Utah 1975).

¶62 Additionally, courts have made clear that one defendant may not compel a codefendant to testify in a joint trial. *See United States v. Hernandez-Rodriguez*, 443 F.3d 138, 144 (1st Cir. 2006); *United States v. Mayfield*, 189 F.3d 895, 901 (9th Cir. 1999). Indeed, out of concern that a defendant's invocation of the Fifth Amendment may improperly prejudice his standing before the court or jury, a defendant is even prohibited from calling a codefendant to the stand to force him to invoke his privilege against self-incrimination. *See United States v. Carella*, 411 F.2d 729, 731 (2d Cir.), *cert. denied sub nom. Erhart v. United States*, 396 U.S. 860 (1969). This is true even if the testimony of the codefendant would help the other defendant's cause. *See* Robert O. Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices*, 77 Mich. L. Rev. 1379, 1440-41 (1979).

¶63 Despite the principles outlined above, Defendant points to *State v. White*, 671 P.2d 191 (Utah 1983), as justification for his claim that his counsel could and should have called Alex to the witness stand. In *White*, a defendant accused of committing armed robbery attempted to introduce statements of a jail inmate that the defendant claimed would show that the inmate had actually committed the robbery. *See id.* at 192-93. The defendant did not call the inmate to the stand; instead, counsel for the defendant explained that she had talked with the inmate's attorney who indicated that if the inmate was called to testify, he would invoke his Fifth Amendment privilege against self-incrimination. *See id.* Because the inmate would invoke the privilege, the defendant argued, the inmate was unavailable and, thus, the defendant could introduce the inmate's prior statements under the statement against interest exception to the hearsay rule. *See id.* at 193. The Court rejected the defendant's proffer that the inmate was unavailable and held that the inmate "could not have been exempted from testifying on the ground of privilege until he had personally asserted his Fifth Amendment privilege under oath in response to a question." *Id.* The Court also noted that "'[a]n attorney for a witness cannot claim a privilege against self-incrimination; he can only advise the witness. In order for the claim to be honored by the court, it must

be made by the witness.'"  *Id.* (alteration in original) (quoting *State v. Anderson*, 27 Utah 2d 276, 495 P.2d 804, 806 (Utah 1972)).

¶64    Based on *White*, Defendant argues that until Alex was placed on the stand and directly claimed his privilege, he could not have invoked the protection of the Fifth Amendment. We conclude, however, that the reasoning of *White* is not applicable here because Alex is a codefendant in this case and not merely a witness. *White* and cases that cite to it, *see, e.g.*, *State v. Smith*, 706 P.2d 1052, 1058 (Utah 1985), hold that a potential *witness* cannot be shown to be unavailable under rule 804 of the rules of evidence, *see* Utah R. Evid. 804, unless the witness is brought before the court and invokes his privilege not to testify in response to some question put to the witness. *See White*, 671 P.2d at 193. This holding does not mean that a defendant in his own criminal trial must be placed on the stand and forced to invoke his right against self-incrimination before the right applies. Indeed, we conclude that the protections provided a witness claiming the privilege of the Fifth Amendment and a *defendant* in his own criminal trial are very different. Specifically, as *White* recognizes, there is a danger that invocation of the Fifth Amendment may lead the court or jury to draw negative inferences. *See id. See also Travis*, 541 P.2d at 799. However, a witness, unlike a defendant, need not fear the negative inferences a court or jury may draw from his invocation of the privilege because the witness's liberty is not in peril in a proceeding in which he is merely called to testify.

¶65    Defendant also makes much of *White*'s language in which the court indicated that a witness had to claim the privilege personally and could not do so through an attorney. We note the unique facts of *White*, however. There, the defendant's attorney proffered that the inmate would not be available to testify. *See White*, 671 P.2d at 193. The State objected to this showing of unavailability. *See id.* at 192. Thus, the Court held that where a potential witness's unavailability is not certain, a defense attorney's proffer that the witness will invoke the Fifth Amendment privilege is not sufficient. We caution against reading this proposition from *White* too broadly. *See Palmer v. State*, 920 P.2d 112, 114 (Nev. 1996) (per curiam). While a witness may not be able to claim the privilege indirectly through counsel, a defendant in his own criminal trial may unequivocally claim the privilege through his attorney, and thus, we see no conflict with *White*.

¶66    Here, all parties knew and stipulated to the fact that Alex invoked his right against self-incrimination. Thus, the court, prosecutor, and Defendant were all prohibited from calling Alex as a witness, regardless of the purpose for which he was called. Accordingly, because Defendant has not convinced us that his counsel could have called Alex to take the stand to force him to invoke the Fifth Amendment,

Defendant's trial counsel did not perform deficiently by failing to do so.[14]  Thus, we conclude that Defendant has not met his burden of establishing that he received ineffective assistance of counsel at trial.  *See Menzies v. Galetka*, 2006 UT 81, ¶ 87, 150 P.3d 480.

## III.  Cumulative Error

¶67    Finally, Defendant contends that the cumulative effect of errors made at trial should undermine our confidence that he received a fair trial.  *See State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7.  Inasmuch as we have concluded that no errors occurred in the proceedings in issue, with the exception of the trial court's entry of an inaccurate but inconsequential finding, Defendant's cumulative error argument must fail.

---

14.  Indeed, because Defendant could not have forced Alex to take the stand, he would not have been able to introduce Alex's statement under rule 801(d)(1)(A) because that rule requires that the declarant "testif[y] . . . and [be] subject to cross-examination concerning the statement," Utah R. Evid. 801(d)(1)(A), which Defendant could not be forced to do in his own trial.

We also note the curious form of Defendant's argument with respect to his claim that Alex's prior statements could have come in under rule 804(b)(3).  Rule 804 creates exceptions to the traditional hearsay rule where the declarant is unavailable.  *See* Utah R. Evid. 804.  Rule 804(b)(3) in particular provides that where a defendant is unavailable, a statement against the declarant's "pecuniary or proprietary" interest, which is trustworthy, may be introduced into evidence.  *See id.* R. 804(b)(3).  Defendant argues that if his counsel had placed Alex on the stand where he would invoke the Fifth Amendment, he would have become unavailable under rule 804.  We note, however, that all parties, the State included, stipulated that Alex was unavailable as a witness because he had invoked the Fifth Amendment right not to testify.  The trial court likewise concluded that Alex was unavailable.  But the trial court ultimately prohibited introduction of Alex's prior statement simply because it was not a statement "against interest" and lacked "trustworthiness."  Thus, as near as we can tell, the trial court's decision to exclude Alex's statement had nothing to do with whether or not he was "available."

CONCLUSION

¶68    We reject Defendant's voluntariness claim because we see no evidence that
Officer Horner engaged in objectively coercive tactics or knew of and exploited
Defendant's alleged mental limitations.  Moreover, we conclude that Defendant was not
entitled to *Miranda* warnings prior to being questioned by Officer Horner because he
was not in custody.  We also conclude that Defendant's counsel did not render
ineffective assistance because even if his counsel had investigated the effect of the
trauma, alcohol, and medication, that evidence would not have demonstrated that
Officer Horner engaged in coercive conduct, as required to establish involuntariness.
Moreover, Defendant's counsel did not perform deficiently in failing to call Defendant's
codefendant Alex to the stand because the codefendant has a constitutional right not to
be called as a witness in his own criminal trial.  Finally, because we see no error of
consequence, Defendant's cumulative error claim fails.

¶69    Affirmed.


_____
Gregory K. Orme, Judge


-----


¶70    WE CONCUR:


_____
James Z. Davis, Judge


_____
Stephen L. Roth, Judge